Nott, Ch. J.,
delivered the opinion of the court:
1. The cause of action confided to the jurisdiction of this court is thus defined by the Act 28th January, 1898 (27 Stat. L., p. 426) : The claim “ of those Indians who were parties to the treaty of Buffalo Creek ” “ growing out of the alleged unexecuted stipulations of the treaty on the part of the United States.”
2. The unexecuted stipulations of the treaty on the part of the United States were these: By the treaty the United States agreed to set apart 1,824,000 acres of land “ as a permanent home for all the New York Indians.” Such of the tribes as did not “ accept and agree to remove to the country set apart for their homes within five years ” were to “ forfeit all interest in the lands set apart.” None of the tribes moved or was removed to the country set apart; none of them made a demand or request for removal; some of them positively refused to remove when requested by agents and commissioners of the United States; others of them denied that they Avere parties to the treaty and averred that it had been procured in their names by corruption and fraud. After twenty-two years thus passed, the United States declared the lands open for public entry and sold them. But the treaty chanced to be in such form that the Supreme Court construed it to be a grant in p’rcesenti, and held that the United States not having declared a forfeiture the title remained in the Indians who were parties to the treaty, and that they Avere entitled to recoA^er the avails of the land, amounting to $1,967,056. (170 U. S. R., 1; 173 id., 464.)
The action, therefore, is substantially one to recover money had and received by the defendants to the use of the plaintiffs; and the primary question uoav before the court is, To Avhom shall this money be paid — who Avere the parties, within the intent of the treaty, that are entitled to receive it?
3. If the Indians had removed to the West, as contemplated by the treaty, the different tribes would have received tracts of land proportionate to their numbers, and the members of the tribes Avould have held as communal OAAmers. The present suit is not to recover land, but money, the proceeds of land, the title of which land was vested in *452 the Indians as communal owners. The proceeds, therefore, in the matter of disposition, must follow the rule which would have governed the disposition of the land. The Government as guardian of the Indians, might have treated the proceeds as a fund to be retained by the guardian, the income to be paid to the communal owners per capita, or it might have treated the fund as Indian lands have been treated, by partitioning them by personal allotment among the communal owners. It has substantially selected the last course. The intent is that each communal owner of the land who would have been entitled under the treaty to 820 acres, if the lands were allotted, shall recover his proportionate part of the fund.
4. In determining who are the communal owners, entitled to be paid per capita, the court will follow Indian laws and customs so far as they do not come in conflict with the laws of the United States or the purposes of the treaty or with natural law and justice.
The court therefore will adhere so far as possible to the fundamental Indian law of communal ownership, and will respect, as long as it does not conflict with the purposes of the treaty, the tribal determination of membership; but the court'must at the same time recognize the fact that an Indian community is not the intact thing which it once was, and that communal ownership is not the well-defined, ascertainable estate, or interest, which it was when there were real communities living in unity and communal possession on communal lands. The changes which had taken place in 1860 when these lands were opened to purchase had even then nearly obliterated the old communal lines; and the changes which have since come have reduced some, if not all, of those communities to little more than voluntary societies held together by the annuities paid by the Government per capita. Thus, for instance, the Oneidas were once a powerful tribe of the Six Nations. They have been divided and subdivided into the New York Oneidas, the Canadian Oneidas, the Wisconsin Oneidas; and the New York Oneidas have been subdivided into two “ Christian parties ” and two a Orchard parties.” There are also Oneidas living upon the Onondaga Reservation, and Oneidas living upon their *453 own lands, and Oneidas to whom lands have been allotted in severalty, and who have become citizens of the State of New York and who have ceased to be, in a political sense, Indians. To accept as final the determination of such communities or societies, on the question of a legal right to participate in the fund.would be an evasion of judicial duty. It would be committing individual rights to the incompetent hands of those who have a direct pecuniary interest in the decision. Neither can the court accept the action'of any community subsequent to the date of the treaty as being a legal determination on the question of communal membership; and where it appears that since the execution of the treaty a communal roll has been tampered with and persons who were not Indians have been admitted to communal membership from improper motives and by arbitrary methods, the court will not regard them as beneficiaries under the treaty or as persons entitled to participate in the fund within the intent of the jurisdictional statute.
5. The treaty of Buffalo Creek, as has been said, was a grant in prcesenti of the lands west of the Mississippi; but it was also an executory contract between the parties. The intent was (which was the chief consideration for the contract) that all the New York Indians should remove West and should receive all the lands designated, and that they should do so within five years, and that if they should fail to do so the contract should come to an end by the United States declaring a forfeiture, in which case it was expressly provided that the Indians should “ forfeit all interest in the lands so set apart.” The lands so set apart were 1,824,000 acres, and the acreage was ascertained by taking the number of all persons belonging to the tribes, so far as known, amounting to 5,485, and adding thereto 215 (apparently for nonenmnerated Indians), and allowing to each person 320 acres of land.
6. The persons, therefore, to be removed to the West and to receive 320 acres of land each, or a communal interest therein, were the Indian communities (embracing by that term all persons affiliated with the Indians) whom the United States desired to remove west of the Mississippi. *454 The United States were not interested in academic questions of Indian blood or Indian citizenship. Whether an Indian family of half bloods residing on an Indian reservation in the State of New York or the State of Wisconsin were children of white men or of white women was, for the purposes of the contract, abstract and irrelevant. That one such family should be called Indian and be allowed to go to the West to acquire lands of the United States, but that the other should be called white and not be allowed to go or to acquire lands, would be an incongruity utterly foreign to the intent of the agreement.
It is true that with the Iroquois, as with almost all Indian tribes, descent was through the mother. The Iroquois woman was the daughter of the tribe unchangeably, irrevocably. She could not marry within the tribe,'for all who were born of the daughters of a tribe were brothers and sisters. When she married it was her husband who came to dwell in her tribe, and not she who passed over to his. If she married a white man she might live in his house and home, but when he died she could return to' her kindred. Maid, wife, or widow, the Iroquois woman was always a daughter of her tribe, and her children were sons and daughters of her tribe; and they, with the sons and daughters of her tribal sisters, alone could be members of her tribe by birthright. Therefore it was that the daughters of the tribe were the mothers of the tribe, and they only. No man could be a son of the tribe unless he was a son of a daughter of the tribe. The Indians therefore held that as the white woman was not the daughter of a tribe, she, on the death of her husband, had no tribe; that she was what she had been— a stranger, an alien, an outcast, and not an Indian. It followed that her children were what she was, exiles without a tribe, and strangers, not of Indian blood.
This was the logical, the inexorable result of Indian law; but the practical results which would come from attempting to carry out the purpose of the treaty according to this Indian law instead of according to the manifest purpose of the contracting parties is well illustrated in a case stated by claimant’s counsel: A full-blooded Seneca Indian married a *455 white woman. The daughter of that union was in fact one-half Indian, but according to Seneca law wholly white. She married a full-blooded Seneca, and her daughter — three quarters Indian — was still, by Seneca law, wholly white. Her daughter — three-quarters Indian — married , a full-blooded Seneca, and her daughter — seven-eighths Indian— was still, according to Seneca law, wholly white. Finally the children of this woman, though their father might be a full-blooded Seneca Indian, and they have fifteen-six-, teenths Seneca blood in their veins, would still, in Indian legal estimation, be wholly white.
7. In what manner the numbers of the different tribes set forth in Schedule A, annexed to the treaty, were ascertained is now unknown, but it was for the interest of the United • States that all persons affiliated with an Indian community should go, and it was for the interest of the Indians that there should be land enough for all. Whether the census in schedule A included white wives and their children is not certain, but in Anew of the intent and purpose of the treaty it must be presumed that it did; and it is certain, apart from such presumption, that there was a considerable margin of land, 68,800 acres, reserved for the Indians over and above the sum total of population enumerated in Schedule A. Such being the manifest purpose of the treaty, and such the means for carrying it into effect, some claimants can not iioav be allowed to come in and say that the sum total of the acreage now represented by the proceeds of the land ($1,967,056) Avas intended for only such persons as were technically citizens or communal* owners in the Six Nations. In determining who Avere the persons termed Indians Avithin 'the intent of the treaty, the court must resort to the actual communities then existing, so far as they can be ascertained, and must carry out the obvious intent of the treaty Avithout being limited by Indian laws or customs which would defeat its chief purpose.
8. The two important dates in this case are 1838, Avhen the treaty Avas entered into, and 1860, when the United States opened the lands to public entry and deprived the Indians of their title without having declared a forfeiture. *456 If, shortly after the signing of the treaty, all of the Indians had been removed to the West and all of the tract had been turned over to them, no one can doubt but that the United States would have required and the Indians would have consented to the removal of every member of each Indian community without regard to blood or citizenship or the Indian law of descent; and if, shortly before I860, the • Indians had then determined to go West, it can not be - doubted but that the United States would have expected and required that all of the Indian communities as then existing should remove if all of the land was to be enjoyed by them. During that twenty-two years there was disintegration and change in each community, and during that twenty-two years the agreement was kept alive by the inaction of the parties, by the failure of one of them to declare a forfeiture. The question, “ Who are the community ? ” continued during that twenty-two years; and it would have been answered at the end as at the beginning. If, in 1859, both parties had determined to carry the treaty into effect, there would have remained the same intent which existed when the treaty was made — that all persons attached to an Indian community should go and should be provided for. The United States wished the one; the Indians expected the other. Consequently, the court must adopt a rule of descent or participation which would embrace all persons whom it was the policy of the United States to remove; and this rule being, ex necessitate rei, once established must continue. A court can not have one rule for one period of time and another for another period of time. The white wife and her children born between 1838 and 1860 were as much Indians within the intent of the treaty as any full-blooded-Indian in the Six Nations; and what was the rule during that period of time must continue to be the rule up to the time of the judgment or the satisfaction of it; that is to say, the children of white mothers and Indian fathers affiliated with the tribe must be reckoned as Indians. The court must look upon the community and its members as such, ant-ean not turn aside into the genealogy of individuals or be turned aside by the peculiarities of Indian laws and cus *457 toms. This is not a question of Indian citizenship or tribal custom or communal ownership in Indian property, but simply a question of contract, of the subject-matter and purpose of a contract, and of the intent of those who entered into it.
9. The treaty of Buffalo Creek was between nine tribes, bands, or subdivisions of Indians, signatories to the treaty as such. The present consideration moving to the United States from the Indians was the cession by these “ several tribes of New York Indians ” to the United States of all their right, title, and interest to certain lands secured to them at Green Bay, Wisconsin, by the treaty of 1831. “ In consideration of the above cession and relinquishment,” “ and in order to manifest the deep interest of the United States in the future peace and prosperity of the New York Indians,” the United States agreed to set apart a tract of country west of the State of Missouri “ as a permanent home for all the New York Indians now residing in the State of New York, or in Wisconsin, or elsewhere in the United States, who have no permanent homes.” Annexed to the treaty is a “ census of the New York Indians as taken in 1837,” made before the execution of the treaty (Schedule A). This refers more particularly to residence, and • contains eleven subdivisions of New York Indians, but all of them residing in New Y”ork and Wisconsin.
Who, then, are the beneficiaries under the second article of the treaty? Primarily, of course, the New York Indians who executed the treaty “ now residing in the State of New York or in Wisconsin;” but the treaty adds an ambiguous term, “ or elsewhere in the United States,” with an ambiguous limitation, “ who have no permanent homes.”
The jorimary purpose of the treaty being to remove all Indians from the East to the West, and the secondary purpose to gather up New York Indians who might not be residing in New York or Wisconsin, but who had no fixed domicile or no affiliation with other tribes (in the words of the treaty, who had “ no permanent homes ”), it must be held that such persons, and only such persons, are the beneficiaries and entitled to participate in the fund. That is to say, In *458 dians who bad acquired a permanent borne with other tribes or who had become more or less affiliated with them, or who were not represented by signatories to the treaty, or who did not relinquish lands in Wisconsin, or who did not signify an intent to return to a New York tribe or to actually remove to the ceded lands before 1860, can not be regarded as “ Indians who were parties to the treaty of Búhalo Creek ” within the intent of the jurisdictional act. By the term “ permanent homes ” we understand something in the nature of domicile; and by a change of domicile avc understand that such Indians lost their old domicile and severed their connection Avith their former tribe and ceased to be communal owners in the tribal property. A more specific designation can be given, but this states the principle upon which the ruling Avill rest.
10. The Oneidas. of Ontario, Canada, Avere domiciled and living in NeAV York in 1838, and were then parties to and beneficiaries under the treaty. In 1842 they sold their lands in NeAV York and moved across the border into Canada. The number who went (320) and the number who remained (300) were about equal. Their going Avas before the breach of the agreement and while the Government Avas anxious and willing to remove all NeAV York Indians to the West. Did they bj^ moving across the border forfeit all right to be removed ? Or were they free to move back across the border prior to 1860 and be among those who might be removed west of the Mississippi ? And what rights have they within the intent and meaning of the decision of the Supreme Court ?
The judgment ($1,967,056) which the Supreme Court has directed in favor of the claimants represents 1,824,000 acres of land reserA^ed by the treaty of 1838, and those 1,824,000 acres of land represent the 5,485 Indians enumerated ini Schedule A of the treaty and 215 Indians not enumerated in the schedule. The Supreme Court has decided that the claimants are entitled to recover this gross amount of $1,967,056, but has not directed this court to so distribute it that one man shall recover another man’s money or that one portion of a tribe shall recover the damages suffered by *459 another portion. It did lie in the mouth of the defendants, the United States, to say that the Oneidas in Canada had forfeited their right to recover, but it does not lie in the mouth of the other Oneidas to say that they are entitled to both their own and the others’ damages.
If the 300 Oneidas who remained in New York had been removed west of the Mississippi immediately after the 320 passed over the border into Canada, it is inconceivable that they would have been awarded land for 620 Oneidas. . If-the Oneidas of New York have no right to recover for the lands of the 320, has the Government .done anything to declare a forfeiture on the part of the 320?
Our Indians are and have been the wards of the United States, and the Indian has no right of expatriation. Whether they may or may not leave the country is a question of- Indian policy. In Sitting Bull’s case they removed to Canada with the intent of remaining there, and became domiciled so far as Indians could be. The Indian policy required that they should be brought back, and they were brought back. In the case of the Kickapoos, they removed to Mexico' with like intent to remain and be domiciled there. The Indian policy required that they be brought back, and they were brought back. In 1842 the Indian policy might have required that the Oneidas be brought back, and if it had, they would have been brought back. They did not cease to be wards of the United States because they had crossed the border and attempted to domicile themselves in a foreign country; and it ivas expressly held in the case of Lowe v. The Kickapoos (37 C. Cls. R., 413) that “ the Indians being wards of the United States can not .suspend that relation without the consent of the Government.” There was no Jaw which prohibited these Oneidas from returning; they had sold their land, but the Senecas might have thrown open their doors as they did to the Cayugas; the United States took no act to sanction their expatriation or to deprive them of their rights under the treaty, and those rights continued until the breach of the agreement in 1860. From an equitable point of view it may be added that they did more to carry out the policy of the United States by removing from *460 the State of New York than any of the Indians who are now represented in this court.
The facts to be noted in relation to these Oneidas of Ontario are these: There was no individual emigration; it was not the case of an individual here and there withdrawing himself from the community and ceasing to be a member of it, leaving the community intact. On the contrary, by communal consent a part of the tribe separated from the other part, taking with them their portion of the communal property. Politically they were not expatriated; they did not become citizens of Canada. Some of them returned to the State of New York, and some of them returned to the United States, going to Wisconsin.
It is settled by the decree of the Supreme Court that these Indians had acquired in 1838 an undivided legal estate in the western lands. It seems tolerably clear that the separation of these Indians as a distinct part of the Oneida community, by mutual consent, retaining their share of other communal property, did not work a transfer of their interest in the lands west of the Mississippi to that part of the community which remained behind. After the decision of the Supreme Court it can not be said that the United States declared a forfeiture against them, either because they removed to Canada or because they failed to remove west of the Mississippi. How, then, could their title have been divested, with no act of forfeiture on the part of the United States? It may be said that their removal from the guardianship of the United States created a personal disability to maintain an action against the United States. This may true, and might perhaps be upheld if the United States had said so. But the jurisdictional act makes no exception. opens the doors of the court to all Indians who were parties to the treaty of Buffalo Creek; and it gives all a remedy all the proceeds of all the lands granted to them in frmsenti bjr that treaty. The effect of the statute is to allow of the Indians to recover for all of the land sold, and the court can neither say that a portion of the Indians may recover for all of the land sold, nor say that the land of some these Indians has, in some indescribable way, become *461 forfeited to the United States, nor that some Indians who were parties to the treaty of Buffalo .Creek are not to be admitted within the jurisdiction of the court.
11. The rolls prepared under the direction of the Secretary of the Interior in this case would be absolutely right and accurate if the questions in the case were those of Indian citizenship or communal ownership, or related exclusively to Indian property and rights.
The court appreciates the work done by direction of the Secretary of the Interior, and regrets that there should be a difference of opinion as to the distribution of the fund; but for the reasons hereinbefore given the court can not regard this as simply a distribution of Indian property by Indian methods according to Indian law and at the dictation of Indian communities. The court, acting judicially, must be controlled by the purpose of the treaty and the terms of the jurisdictional act. It can not exclude from rolls Indians who were or whose ancestors were parties to the treaty of Buffalo Creek, and it can not admit as beneficiaries Indians who were not parties to the treaty of Buffalo Creek and whose ancestors were not. Neither can the court uphold the unsatisfactory, if not fictitious, rolls Avhich some of the parties have framed, nor can the court allow Indian law or custom or decision to determine who shall participate in the distribution of this fund, and in effect decide, who were persons intended to be removed from New York and Wisconsin to the country ■west of the Mississippi.
For the reasons subsequently stated the court is also of the opinion that the rolls by separate tribes or bodies of communal owners, giving different amounts to the members of different communites, will have to be so recast as to bring all participants to one common amount.
But the court is of the opinion that the limit set by the Secretary of the Interior within which parties were required to appear and present their claims is sound in principle, and that the limit named by him, the 31st of December, 1901, must be upheld. When a fund is to be distributed equally among many persons it is inevitable that there must be a day of distribution; and where the fund to be distrib- *462 utecl is communal property it is likewise inevitable that the day of distribution must be one arbitrarily fixed, which will enable the officers of a court or other custodians of the fund to ascertain the number of recipients and the amount of expenses which will be a charge upon the fund, and to ascertain the names and individual rights of the recipients. The court regards the action of the Secretary in the steps taken by him' to notify parties to come in and in the selection of the day named, as not only reasonable, but as eminently just and wise.
12. The most doubtful and most perplexing question in this case (which is crowded with perplexing questions) is, “ Upon what basis shall the distribution of the fund be made? ” Three have been suggested.
The first is to regard the communal property as having vested personally in the communal owners at the time when the treaty was executed (or perhaps more properly, at the time when the United States sold the lands), and then to trace down individually and personally, per stirpes, the descendants of those original owners and decree payment to them per capita in the different amounts which family changes and vicissitudes must have brought about.
There are two objections to this. When it is remembered that communal ownership extends equally to men and women and children and infants in arms, it is apparent that to determine with precision who were the communal owners in different groups and scattered homes of more than five thousand Indians on a given day forty-five or sixty-seven years ago would be an absolute impossibility. The other objection is, that this fund being Indian property, the court should, so far as possible, conform to Indian law, and especially to that great fundamental principle of Indian law— communal, and not individual ownership.
The second basis is to take the census denominated “ Schedule A,” annexed to the treaty, as a guide, and to regard the Indians (5,485 in number) as forming 11 distinct communities, and to apportion the fund among them in proportion to the numbers shown by the census, thereby making eleven communal funds to be divided each among *463 the individuals now forming actually or constructively these eleven communities.
The third basis is to regard all of the Indians who were parties to the treaty as one community, and to distribute the fund among all the Indians and descendants of Indians now existing share and share alike.
As to the second basis, it may be conceded that the treaty (article 2) contemplated two things, viz: That the Indians would actually remove to their future home beyond the Mississippi, and that the land there should be “ divided equally among them according to their respective numbers, as mentioned in the schedule hereunto annexed ” (the census, Schedule A). Previously, in the same article, the treaty had mentioned 1,824,000 acres of land as the tract granted, “ being 320 acres for each soul of said Indians as their numbers are at present completed.'1'' The numbers mentioned in Schedule A, multiplied by 320, give an acreage of but 1,755,200 acres, leaving an excess of 68,800 acres. This excess was probably intended for Indians who might have been overlooked in the enumeration of the census. It is at the same time manifest that all of these eleven communities could not be moved westward in one day and told to divide their lands among themselves in proportion to their respective numbers, but that they would be moved in small bodies and, on their arrival, have allotted to them quantities of land at the rate of 320 acres to each emigrant. Other provisions of the treaty also show that it was contemplated that some of the tribes might not remove; and as to them the third article provided that 'those who did not remove- “ within five years, or such other time as the President may, from time to time, appoint, shall forfeit all interest in the lands so set apart.” In a word, the grant was en bloc, but. the treaty contemplated the removal of 9 or 11 distinct communities, with distinct allotments of land in proportion to their numbers.
The Secretary of the Interior has proceeded upon this-.theory in preparing rolls in this case; and if the fund is to be distributed only among those Indians who are annuitants and on the rolls of the Indian Office, this theory would have *464 very strong support in those facts. The objections to it are, first, that it ends in an inequitable result. According to it one community of Indians — the Oneidas — will receive more than $1,000 per capita, and another — the Stockbridges and Munsees — only $147 per capita. It would be irrational to attribute this immense difference of 747 per cent to natural causes. It is manifest that there has been an error in past computations, or that there has been emigration from tribe to tribe, or that something other than natural growth has brought about this immense disparity in the result.
Another objection to the second basis relates back to the true intent of the treaty. That true intent unquestionably was that every Indian emigrant or beneficiary under the treaty should receive at least 320 acres of land without reference to the number of persons in his tribe or the number of members in his family. That the true intent- ivas not carried out was due to the inaction of both parties. The treaty contemplated keeping the tribes on separate allotments of land, but the primary and paramount intent was, as stated, that each Indian beneficiary should receive at least 320 acres of land. The provisions for segregating the tribes and giving each its own share, founded upon 320 acres for each individual, were not antagonistic or alternative to the primary intent, but in furtherance of it. If the treaty had been carried into effect within five years, as contemplated, there would have been no dispute whatever upon this point. Such being the intent of the treaty, the question is whether the inaction of the parties and the sale of the lands and the substitution of the fund for the land are to change this primary basis of distribution.
The communal changes referred to in subdivision 2 of this opinion — changes which have taken place since 1838— constitute, in the opinion of the court, an answer to this question. The most marked justice of which this distribution is susceptible will be attained by carrying it back to the time of the treaty and doing now as would have been done then, treating every individual Indian as every other, individual Indian is treated. If these Indian communities had continued to exist as they once existed, each community *465 occupying its own territory and every daughter of every tribe, and they only, remaining always the only daughters and the only mothers of the tribe, it would have been feasible to distribute the fund accordingly, disregarding the minor changes made by prosperity or adversity and natural growth or natural decay. But in the existing condition of affairs, it seems wisest and most just to make the first basis of distribution the final basis of distribution — to distribute the fund as the land would have been distributed in 1838— equally to each and all.
A decree will be entered in this case following the form of that which was entered in the case of Whitmire, trustee, v. The Cherokee Nation (30 C. Cls. R., 190) and in accordance with the directions heretofore set forth in this opinion.
It will provide for the preparation of rolls and for the payment of the fund to the parties per capita, and that the charge of such preparation of the rolls and the cost of distribution shall be a charge upon the fund,' to be first deducted therefrom so far as the same are not covered sufficiently by the appropriation for that purpose heretofore made by Congress.
The decree will also provide for the compensation of counsel and expenses and disbursements incidental to litigation, if any.
' Pursuant to the opinion of the court the following decree was entered on the 18th May, 1905 :
This-cause coming on to be heard under the order of this -court of January 3, 1905, and upon the petitions, answers, motions, agreed facts, proofs, briefs, and arguments submitted by the parties respectively in accordance with said order, and the court having heard the same and considered the just rights of all persons in interest, in pursuance of the authority vested in the court by the act of Congress entitled “An act to authorize the Court of Claims to hear and determine the claims of certain New York Indians against the United States,” approved January 28,1893 (27 Stat. L., 426).
1. And it appearing to the court that by the act of Congress of February 9, 1900 (31 Stat. L., 27), Congress appro *466 priated the sum of $1,998,744.46 to pay the judgment of this court in favor of the New York Indians rendered in this cause on the 22d day of November, 1898, together with the accrued interest thereon; and it further appearing that by acts of Congress of March 3, 1901 (31 Stat. L., 1077), May 27, 1902 (32 Stat. L., 263), and April 21, 1904 (33 Stat. L., p. 208), the Secretary of the Interior was authorized and directed to withhold from the amount appropriated by the aGt of February 9, 1900, to pay said judgment, the sums of $10,000 and $5,000, respectively, and to apply the same to the payment of expenses necessary in ascertaining the beneficiaries of said judgment, and to employ the necessary clerical force; and it further appearing that in pursuance of the said act of March 3, 1901, the Secretary of the Interior gave due notice by three months’ publication in newspapers published in the States of New York, Wisconsin, Missouri, and Kansas, and in Indian Territory and Oklahoma, and by posters distributed' to Indian agents and postmasters throughout the same region, requiring all persons claiming to be entitled to a share in the fund arising from said judgment to file their applications therefor in the Office of the Commissioner of Indian Affairs on or before the 31st day of December, 1901, which said date the Secretary of the Interior fixed as the day as of which the enrollment of the said individual beneficiaries of said fund should be made, and after which no further applications would be received, it is therefore this 18th day of May, 1905, adjudged, ordered, and. decreed that the said notice given by the Secretary of jthe Interior to all persons claiming to be entitled to share in said fund arising from said judgment as aforesaid be, and the same is hereby, approved, ratified, and confirmed, and held to be a good and sufficient notice for all the purposes of this case; and it is further adjudged, ordered, and decreed that the said date of December 31, 1901, be, and the same is hereby, approved, ratified, and confirmed as the date for the enrollment of the said individuals entitled to share in said judgment aforesaid; and that the claims of individuals filing applications after said date shall not be considered except as hereinafter provided.
*467 2. And it further appearing that in further pursuance of said acts aforesaid the Secretary of the Interior caused to be made and duly approved certain rolls of the individual beneficiaries of the several tribes of the New York Indians, to wit, the Seneca, Cayuga, Onondaga, Tuscarora, Oneida,'St. Regis, Stockbride and Munsee, and Brothertown tribes, who were living and entitled to participate in the fund arising from said judgment on the 31st day of December, 1901; and it further appearing that no objection was filed in accordance with the requirements of the said order of January 3, 1905, by any person or tribe to the enrollment of any of the individuals of the said Seneca, Cayuga, Onondaga, Tuscarora, Oneida, St. Regis, and Brothertown tribes so enrolled by the Secretary of the Interior:
It is therefore further adjudged, ordered, and decreed that the right of each of the individuals enrolled as aforesaid by the Secretary of the Interior as entitled to share in the said fund arising from said judgment as aforesaid as members of the Seneca, Cayuga, Onondaga, Tuscarora, Oneida, St. Regis, and Brothertown tribes, be, and the same is hereby, affirmed, ratified, and confirmed.
And it further appearing that pursuant to the said order of January 3,1905, objections to the enrollment of the Stock-bridge and Munsee tribe, as made and approved by the Secretary of the Interior, were filed on behalf of Zachariah Miller and others in a petition entitled “ Petition by the Stockbridge and Munsee, No. 78,” and in a certain “Answer of the protestants to the order of the court in case No. 17861 of the Court of Claims,” filed March 30, 1905, and in a certain answer of the-protestants to the order of the court in case 17861, filed April 3, 1905, on behalf of said protestants; and it further appearing that by the terms of the treaty of February 5,1856 (11-Stat. L., p. 663), a roll was established fully determining the membership of said Stockbridge and Munsee tribe, which treaty was duly ratified and confirmed by the Senate of the United States and proclaimed by the President; and it appearing that the roll thus established was continuously recognized by the United States and by *468 said tribe as correctly setting forth the members of the tribe until and after the year 1860:
It is therefore further adjudged, ordered, and decreed that the commissioner hereinafter named shall strike from the roll of the Stockbridge and Munsee tribe, so made and approved by the Secretary of the Interior, as aforesaid, the names of all such persons so objected to as aforesaid, such persons being specifically named in a paper herein filed on behalf of said petitioners containing the names of Percy Aaron and 180 others, as are not set forth in said roll of the Stockbridge and Munsee tribe established by said treaty of February 5, 1856, as aforesaid, or are not descendants of persons so named in said roll, or are not persons who became members of “ the Stockbridge and Munsee tribe under the provisions of article 6 of the treaty of February 5, 1856, or their descendants.”
And it is further adjudged, ordered, and decreed that the right of each of the individuals enrolled as aforesaid by the Secretary of the Interior as entitled to share in said fund arising from said judgment as members of the Stockbridge and Munsee tribe, except such as shall be so stricken from said roll by the said commissioner as aforesaid, shall be and the same is hereby affirmed, ratified, and confirmed, and the said commissioner shall enroll all such members of the said Stockbridge and Munsee tribes as shall be thus determined to be entitled to share in the fund arising from said judgment as aforesaid.
3. It further appearing that the said roll of the individual members of the Oneida tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior as aforesaid, did not contain the names of any of the individuals included in the petition filed herein on the 3d day of April, 1905, by Messrs. Robeson and Hemphill on behalf of William K. Cornelius and others, entitled “ Petition of the Oneida Indians of Ontario for leave to share in the distribution of the fund arising from the judgment rendered in this cause; ” and it further appearing that the attorneys for said petitioners appeared before the Secretary of the Interior prior to the 31st day of December, *469 1901, and .asserted the right of said petitioners to share in said fund, but that' said right was then denied by the Secretary of the Interior, and that the said petitioners were not allowed to receive application blanks or to file applications for a share in said fund; and it further appearing that the material facts relative to the claims of said Oneida Indians of Ontario, Canada, as stipulated by the attorneys for the respective parties in interest, are as follows: •
That prior to the treaty of Buffalo Creek of January 15, 1838, nearly half of the Oneida tribe of New York Indians had removed to Wisconsin, where they occupied a separate reservation. The two divisions of the tribe were each divided among themselves into certain other parties or bands known as the first and second Christian parties and the first and second Orchard or Pagan parties. This division into parties had existed for some time prior to said treaty, and the Oneida Reservation in New York was partitioned among said parties about the year 1805. In 1839, after the execution of the treaty of Buffalo Creek, but before its final ratification and proclamation by the President, a movement was set on foot among the Oneidas remaining in New York looking to the division of their lands in that State, and the removal of a considerable part of said Oneidas from New York to Canada. ’With this in view certain chiefs representing those Oneidas desiring to move to Canada visited Canada in 1839 and obtained the consent of the Canadian authorities to such removal, said chiefs giving assurances that the Indians desiring to so remove had never, been hostile to Great Britain and did not like the people of the United States, and, if they were allowed to remove, pledging their loyalty to the British Crown. The chiefs further stated that there was an effort being made to induce them to remove west, but they did not wish to go. The consent of the Canadian authorities was secured at this time, and also negotiations were opened for the purchase of a tract of land in Canada. Just subsequent to the proclamation of the treaty of Buffalo Creek, and in the years 1840, 1841, and 1842, treaties were entered into between the State of New York and the several parties of the Oneida Indians in New *470 York, by the terms of which those Indians wishing to remove to Canada sold their interest in their lands" in New York to the State of New York, and, with the consent of the other Oneidas in New York and with the sanction and assistance of the State of New York, removed in parties to Canada, and, with a portion of the money obtained, purchased a reservation in Canada, where they still reside, and where they maintain a separate tribal organization, not having become affiliated with any other tribe in Canada, and not ’ receiving any annuities from Canada. They are now known in Canada as the Oneidas of the Thames, and their lands are held in trust for them by the Crown of Great Britain, and they are under the general supervision of a Canadian Indian agent. The Government of the United States took no part in their removal to Canada, and made no objection to such removal. Since their removal to Canada the United States has had no dealings with the said Ontario Oneidas, and they have not received any portion of the annuity in cloth granted to the Oneidas and the other tribes of the Six Nations of New York Indians by the United States under the treaty with said Indians in 1795. The total number of Oneidas removing from New York to Canada was about 400, and of these some subsequently removed to Wisconsin and were readmitted into the tribe there, while others returned to New York and have been readmitted into the tribe in New York. The number of these claimants is now about 820, each of whom claims to be either one of the said Oneida Indians, so removing to Canada between the years 1840 to 1842, or a direct descendant from one of said Indians. Under an act of the State of New York of 1843 the lands remaining to the Oneidas in New York were partitioned among said Oneidas, and about the year 1846 a large number of them, about 150, removed to Wisconsin and became associated with the Wisconsin Oneidas. Of the Oneidas remaining in New York about 150 are regarded as citizens, while the balance, about 128, reside on the Onondaga reservation and are not regarded as citizens of said State. The Oneidas in New York maintain for certain purposes their tribal organization and transact business affecting their whole number in *471 general councils, and continue to be represented in the general councils of the Six Nations of New York Indians.
The reservation of the Oneida Indians in Wisconsin, except about 85 acres held for school purposes, has been allotted to said Indians under the provisions of the act of Congress of 1887 (24 Stat. L., 388), and said lands are now held in accordance with said act. Said Oneidas in Wisconsin now number about '2,000 and are citizens of that State, but still transact business relating to their whole body in general councils, and such councils are at times called by the Secretary of the Interior. The said Oneida Indians in Wisconsin and New York now receive all the annuities payable by the United States to the Oneida tribe under the said treaty of 1795 above referred to. Since their removal to Canada the said Ontario Oneidas have not been recognized by the Oneida Indians of New York and Wisconsin as a part of the Oneida tribe of New York Indians, and said Oneidas of Ontario have not participated in any of the general councils of the said Six Nations of New York Indians.
It is therefore further adjudged, ordered, and decreed that the said claimants shall have until the 31st day of July, 1905, unless the court shall extend the time for cause shown, within which to file with the court their individual applications setting forth the basis of their claim to be enrolled as one of the.New York Indians entitled to share in said judgment, such applications to be sworn to, and in such form as shall be provided by the commissioner hereinafter named.
Applications for minor children shall be made by their parents or guardians, and the applications for such claimants as have died since December 31, 1901, shall be made by their next of kin or legal representative.
And it is further adjudged, ordered, and decreed that such of said claimants, so filing applications as aforesaid, as shall establish the facts that they were living on December 31, 1901, and that they are Oneida Indians who were parties to the treaty of Buffalo Creek, or are descendants of such Indians, or were affiliated or associated with said Oneida Indians at the date of said treaty, or are the descendants of persons that were so affiliated or associated with said Oneida *472 Indians, and who shall further establish the fact that they have not, since said treaty, been affiliated with any other tribe of Indians other than one of the tribes of New York Indians .parties to said treaty, and have not received any annuities or other tribal funds as members of any other such tribe or- band of Indians, shall be enrolled by the said commissioner as fully entitled to share in the distribution of said fund arising from the judgment aforesaid.
4. It further appearing that the roll of individual members of the Seneca tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior as aforesaid, does not contain the names of any of the individuals included in the petitions filed herein by Hattie R. Calhoun and others and by Jasper W. Seeley and others, and the petition entitled “ Petition of Senecas who have not been enrolled by the Secretary of the Interior,” who are known and styled as “ the mixed-blood Senecas; ” and it further appearing that said claimants made due application to the Secretary of the Interior for enrollment; and it further appearing that the material facts relative to the claim of said petitioners are as follows: That said petitioners claim to be descendants on their fathers’ side of, Seneca Indians who were parties to the treaty of Buffalo Creek of January 15, 1838, or to be the descendants of such parties, but said petitioners can not trace descent through their mothers to any such Indian member of the tribe at the date of said treaty; that under the laws and customs of the Seneca Nation membership in said tribe or nation is dependent upon descent through the mother, and no child of a Seneca Indian and a white or nontribal woman is recognized by the tribe as entitled to membership therein, or to share in the distribution of annuities or other tribal funds or property; that the said claimants have never been enrolled as members of said tribe or nation and have never been recognized as members of said tribe by the United States Government; that under the laws and customs of said Seneca Nation as recognized by the Government of the United States said claimants have not been allowed to receive 'any portion of the annuities payable by the Government to said Seneca Na *473 tion, or any part of the income from the trust funds held by the United States for said nation, or any part of the rents, obtained from leases of tribal lands made by said nation or from leases of oil privileges made by said nation as provided by acts of Congress; that such claimants have the right under the laws and customs of the said Seneca Nation to continue to occupy and enjoy the benefit of such portion of the tribal lands as may have been taken up and segregated by their fathers or ancestors.
It is further adjudged, ordered, and decreed that such of said claimants as shall establish before the commissioner hereinafter named the fact that they were members of the Seneca Nation at the time of the treaty of Buffalo Creek, January 15, 1838, or descendants of such persons, or were affiliated or associated with said Seneca Nation at said date, or are the descendants of such persons, shall be enrolled by said commissioner as entitled to share in the distribution of the fund arising from said judgment, provided that said claimants shall not have become affiliated with any other tribe not one of the parties to said' treaty of Buffalo Creek. It is further ordered, adjudged, and decreed that such of the said claimants as did not file individual applications before the Secretary of the Interior shall file such applications in this court on or before the 31st day of July, 1905, unless the court shall extend the time for cause shown, in' the manner-provided above in the case of the Oneida Indians of Ontario,. Canada.
5. It further appearing that the roll of the individual members of the Brothertown tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior aforesaid, does not contain the names of the individuals included in the petition filed herein by Archie Boyer and others, entitled “ Petition of Brothertowns who have not been enrolled by the Secretary of the Interior,” it is adjudged, ordered, and decreed that such of- the claimants named in paragraph 8 of said petition as shall be able to establish the fact that they were members of the Brothertown tribe of Indians at the date of the treaty of Buffalo' Creek, January 15, 1838, or descendants of *474 such persons, or affiliated or associated with said Brother-town tribe at such date, or are descendants of such persons, and who can further establish the fact that since said date of 1838 they have not been affiliated with any tribe of Indians other than one of the tribes of New York Indians parties to said treaty, and who further can establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said Brothertown tribe, shall be enrolled by the commissioner hereinafter named as parties entitled to share in the fund arising from said judgment.
It is further adjudged, ordered, and decreed that such of said claimants as did not file individual applications before the Secretary of the Interior, shall file such applications in this court on or before the 31st day of July, 1905, unless the court shall extend the time for cause shown, in the manner provided above in the case of the Oneida Indians of Ontario, Canada.
It is further adjudged, ordered, and decreed that said petition, so far as it relates to the claims of individuals named in the ninth, tenth, and eleventh paragraphs of said petition, shall be, and it is hereby, dismissed, as it appears that the parties therein claiming have since the treaty of Buffalo Creek aforesaid become affiliated with and receive benefits as members of some tribe other than one which was a party to the treaty of Buffalo Creek aforesaid.
6. It further appearing that the roll of the individual members of the Onondaga tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior, as aforesaid, does not contain the names of the individuals included in the petition filed herein by David John and others, entitled “ Petition of Onondagas who have not been enrolled by the Secretary of the Interior,” it is adjudged, ordered, and decreed that such of said claimants named in said petition as shall be able to establish the fact that they were members of the Onondaga tribe at the date of the execution of the. treaty of Buffalo Creek, January 15, 1838, or that they are the descendants of such persons, or that they were affiliated or associated with the said *475 Onondaga Indians at the time of the execution of said treat3^, or are the descendants of persons who were so affiliated or associated with said Onondagas, and who can further establish the fact that since said date of 1838 they have not been affiliated with any tribe of Indians other than one of the tribes of New York Indians parties to said treaty, and who can further establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said Onondaga tribe, shall be enrolled by the commissioner .hereinafter named as parties entitled to share in the fund arising from said judgment.
It is further adjudged, ordered, and decreed that such of the said claimants as did not file individual applications before the Secretary of the Interior, shall file such applications in this court on or before the 31st day of July, 1905, unless the court shall extend the time for cause shown, in the manner provided above in the case of the Oneida Indians of Ontario, Canada.
7. It further appearing that the roll of the individual members of the Oneida tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior as aforesaid, does not contain the names of the individuals included in the petition filed herein by Angeline Knaggs and others, entitled “ Petition of individual members of the Oneida tribe of New York, filed pursuant to the order of the court made January 3, 1905,” and in the petition filed herein by Henry K. Powless and others, entitled “ Petition of the Oneidas of the United States who have not been enrolled by the Secreta^ of the Interior,” it is adjudged, ordered, and decreed that such of said claimants as shall be able to establish the fact that they were members of the Oneida tribe of Indians at the date of the treaty of Buffalo Creek, January 15,1838, or are the descendants of Oneida Indians who were parties to said treaty, or that they were affiliated or associated with said Oneida tribe at said date, or are the descendants of persons who were so affiliated or associated with said tribe, and who can further establish the fact that since said date of 1838 they have not *476 been affiliated with any tribe of Indians other than one of the tribes of New York Indians, parties, to the said treaty, and who can further establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said Oneida tribe, shall be enrolled by the commissioner hereinafter named as parties entitled to share in the fund arising from said judgment.
It is further adjudged, ordered, and decreed that such of said claimants as did not file individual applications before the Secretary of the Interior, shall file such applications in this court on or before the 31st day of July, 1905, unless the .court shall extend the time for cause shown, in the manner provided above in the case of the Oneida Indians of Ontario, Canada.
8. It further appearing that 'the roll of the individual members of the St. Regis tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior, as aforesaid, does not contain the names of the individuals included in the petition filed herein by Catherine Oake and others, entitled “ Petition of the St. Regis Indians who have not been enrolled by the Secretary of the Interior,” it is adjudged, ordered, and decreed that such of the individuals as are named in paragraphs 7 to IS, both inclusive, of said petition, as shall be able to establish the fact that they were members of the American St. Regis tribe of Indians at the date of the treaty of Buffalo Creek, January 15,1838, or descendants of such persons, or affiliated or associated with said St. Regis tribe at said date, or are descendants of such persons, and who can further establish the fact that -since said date of 1838 they have not been affiliated with any tribe of Indians other than one of the New York Indian tribes, parties to said treaty, and who further can establish the fact that thejr made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said St. Regis tribe, shall be enrolled by the commissioner hereinafter named as parties entitled to share in the fund arising from said judgment.
It is further adjudged, ordered, and decreed that such of *477 said claimants as did not file individual applications before the Secretary of the Interior, shall file such applications in this court on or before the 31st dajr of July, 1905, unless the court shall extend the time for cause shown in the manner provided above in the case of the Oneida Indians ojE Ontario, Canada.
It is further adjudged, ordered, and decreed that said petition, so far as it relates to the claims of individuals named in paragraphs 19 and 20, be, and it is hereby, dismissed, as it apjoears that the parties therein mentioned are claiming on behalf of the estates of Indians who died prior to December 31, 1901, the date fixed upon by the Secretary of the Interior as the date for the enrollment of the individual beneficiaries entitled to share in the fund arising from said judgment.
9. It further appearing that the roll of the individual members of the St. Regis tribe entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior, aforesaid, does not contain the names of the individuals included in the petition filed herein by John Benedict and others, entitled “ Petition of the St. Regis Indians, of New York, who have not been enrolled by the honorable Secretary of the Interior for participation in judgment in Court of Claims in favor of the New York Indians,” it is adjudged, ordered, and decreed that such of the claimants as shall be able to establish the fact that they were members of the American St. Regis tribe of Indians at the date of the treaty of Buffalo Creek, January 15, 1838, or are the descendants of said tribe who were parties to said treaty or that they were affiliated or associated with said American St. Regis tribe of Indians at said date, or are descendants of persons who were so affiliated or associated with said tribe, and who can further establish the fact that since said date of 1838 thejr have not been affiliated with any tribe other than one of the tribes of New York Indians parties to said treaty, and who can further establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said American St. Regis Indians, shall be enrolled by the *478 commissioner hereinafter named as parties entitled to share in the fund arising from said judgment.
It is further adjudged, ordered, and decreed that such of said claimants as did not file individual applications before the Secretary of the Interior shall file applications in this court on or before the 31st day of July, 1905, unless the court shall extend the time for cause shown, in the manner provided above in the case of the Oneida Indians of Ontario, Canada.
10. It further appearing that the roll of individual members of the Stockbridge and Munsee tribe of Indians entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior, as aforesaid, does riot contain the names of any of the individuals included in the petition filed herein by Elizabeth Antone and others, which said petition is designated as the “ Petitioin of individual members of the Stockbridge and Munsee tribe of Indians filed pursuant to the order of the court, made January 3, 1905,” it is adjudged, ordered, and decreed that such of said petitioners as shall establish the fact that they were members óf the Stockbridge tribe or the Munsee tribe at the date of the treaty of Buffalo Creek, or that they are the descendants of such persons, or that they were affiliated with either the said Stockbridge tribe or the Munsee tribe at the date of said treaty, or are the descendants of such persons so affiliated or associated, and who further establish the fact that they have not been affiliated with any tribe not a party to said treaty, and who further establish the fact that they made application to the Secretary of the Interior on or before December 31, 1901, for enrollment as entitled to share in the fund arising from said judgment, shall be enrolled by the commissioner hereinafter named as entitled to share in the fund arising from said judgment as aforesaid.
11. It further appearing that the roll of indivdual members of the Tuscarora tribe of Indians entitled to share in the fund arising from said judgment, prepared and approved by the Secretary of the Interior, as aforesaid, does not contain the names of any of the individuals included in the pe *479 tition filed herein by Martha C. Jonathan and others, which said petition is entitled “ Petition of Tuscaroras who have not been enrolled by the Secretary of the Interior,” it is adjudged, ordered, and decreed that such of the claimants named in said petition, with the exception of Alex Garlow, named in the seventeenth paragraph of said petition, as shall establish the fact that they were members of the Tuscarora tribe at the date of the treaty of Buffalo Creek, or that they are the descendants of such parties, or that they were affiliated or associated with the said tribe at the date of the said treaty, or are the descendants of persons Avho were so affiliated or associated, and who further establish the fact that they haAre not been affiliated with any other tribe not a party to thesaid treaty of Buffalo Creek; and who further establish the fact that they made application to the Secretary of the Interior on or before December 31, 1901, for enrollment as entitled to share in the fund, arising from said judgment, shall be enrolled by the commissioner hereinafter named as entitled to share in the fund arising from said judgment as aforesaid.
It is further adjudged, ordered, and decreed that such of said claimants as did not file individual applications before the Secretary of the Interior shall file such applications in this court on or before the 31st day of July, 1905, unless the court shall extend the time for cause shown.
It is further adjudged, ordered, and decreed that so much of the said petition as relate's to the claim of the said Alex GarloAV, in said seventeenth paragraph thereof, be, and the same is hereby, dismissed, as it appears that he claims only as heir-at-law of Mary Garlow, and that the said Mary Garlow died prior to December 31, 1901, the date fixed by the Secretary of the Interior for the enrollment of the individuals entitled to share in said fund arising from said judgment as aforesaid.
12. It is further adjudged, ordered, and decreed that the persons named in the petition, the first being Minnie Wade Leonard, entitled “ Petition of NeAv York Indians wTho have not been enrolled by the Secretary of the Interior,” claiming to be Stockbridge or Munsees, shall be en *480 rolled by the commissioner hereinafter named as parties entitled to share in the fund arising from said judgment as aforesaid, provided said claimants shall be able to establish the fact that they ivere members of the Stoclcbridge or Mun-see tribe of Indians at the date of the treaty of Búífalo Creek, or the descendants of such persons, or that they ivere affiliated or associated with either the said Stoclcbridge or Munsee tribe at the date of the said treaty, or are the descendants of such persons, and can further establish the fact that since the date of said treaty they have not been affiliated with any tribe of Indians other than one of the tribes of New York Indians parties to said treaty, and can further establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said Stoclcbridge or said Munsee tribe.
13. It is further adjudged, ordered, and decreed that the persons named in the petition filed by Jack Armstrong, entitled “ Petition of certain Cayuga Indians residing in the Indian Territory,” shall be enrolled by the commissioner hereinafter named as entitled to share in the distribution of the fund arising from the said judgment, provided they are able to show that they were members of one or the other of the tribes named, namely, the Senecas, Cayugas, or Oneiclas, at the date of the treaty of Buffalo Creek, or are descendants of such persons; or that they were affiliated or associated with one or the other of said tribes at ,the date of said treaty, or are the descendants of persons who were so affiliated or associated, or that they were recognized by the Government of the United States as New York Indians and as such were placed upon the reservation then belonging to the New York Indians in Kansas, pursuant to the terms of the treaty of Buffalo Creek and prior to the year I860; and provided their show further that they have not since the date of said treaty become affiliated with any other tribe than one of the tribes comprising the New York Indians parties to the said treaty of Buffalo Creek.
14. It is further adjudged, ordered, and decreed that the petition filed herein on behalf of Smith Nichols and others, *481 entitled “Petition, of certain Seneca, Cayuga, and Oneida Indians residing in the Indian Territory,” be, and the same is hereby, dismissed, as it appears that the parties named therein were not on January 15, 1838, members of any of the tribes of New York Indians which ivere parties to said' treaty of Buffalo Creek of January 15, 1838.
15. It is further adjudged, ordered, and decreed that the petition filed herein on behalf of Jack Armstrong and others, entitled “ Petition by certain Seneca, Cayuga, Oneida, and other New York Indians residing in the Indian Territory,” be, and the same is hereby, dismissed, as the said petition does not conform to the requirements of the said order of January 3, 1905, and states no grounds upon which a claim could be properly based or considered, and the petition to which this is made supplemental has been dismissed.
16. It is further adjudged, ordered, and decreed that the petition herein filed on behalf of Esther Beaver and others and designated as “Petition of certain individual New York Indians belonging to the Seneca and Brothertown tribes of Indians, parties to the treaty of Buffalo Creek, January 15, 1838,” so far as it relates to the claims of persons therein described as Brothertown and Seneca Indians, be, and the same is hereby, dismissed, as it appears that the petitioners named therein are now affiliated with tribes of Indians not parties to the said treaty of Buffalo Creek.
It is further adjudged, ordered, and decreed that the commissioner hereinafter named shall enroll Maud Annunson, Loretta Davidson, Laura Hall, Grace A. Bobinson, Adam Sheriff, Charles Sheriff, Dora Sheriff, George Sheriff, Nellie Anunson, Bennie D. Anunson, Lloyd Anunson, N. T. Johnson, and Millard Sheriff, named in the aforesaid petition as entitled to share in the fund arising from said judgment as members of the Oneida tribe, provided such claimants shall be able to establish the fact that they were members of the Oneida tribe of Indians at the date of the treaty of Buffalo Creek, January 15, 1838, or descendants of such persons, or affiliated or associated with said Oneida tribe at said date, or are descendants of such persons, and can further estab *482 lish the fact that since said date of 1888 they have not been affiliated with any tribe of Indians other than one of the tribes of New York Indians parties to said treaty, and can further establish the fact that they made application before the Secretary of the Interior prior to December 31, 1901, to be enrolled as members of said Oneida tribe.
17. It is further adjudged, ordered, and decreed that the petition filed herein, entitled “ Petition in behalf of the estates of New York Indians which have been refused enrollment by the Secretary of the Interior for the purpose of participating in the New York Indians judgment,” be, and the same is hereby, dismissed, as it appears that said petition is filed only on behalf of the estates of persons who died prior to December 31, 1901, the date fixed by the Secretary of the Interior as the date for the enrollment of the individual beneficiaries, entitled to share in said fund arising from said judgment as aforesaid.
18. It is further adjudged, ordered, and decreed that the petitioners named in the petition filed by George E. Chotean and others, entitled “ Petition of George E. Choteau and other New York Indians,” shall be enrolled by the commissioner hereinafter named as entitled to share in the distribution of the fund arising from the said judgment, provided they can establish the fact that they were members of some one of the tribes of the New York Indians at the date of the execution of the said treaty, or the descendants of such persons; or that they were.affiliated or associated with some one of the said tribes of New York Indians at the date of said treaty, or are the descendants of such persons so affiliated or associated: Provided also, they can establish that they have not, since the date of the execution of the said treaty of Buffalo Creek, become affiliated with any other tribes than those comprising the New York Indians: And provided further, they show that they presented their claims to share in the distribution of the said fund to the Secretary of the Interior prior to December 31,1901.
19. It is further adjudged, ordered, and decreed that the petitioner named in the two petitions filed by Charles M. Silas entitled, respectively, “ In the matter of the application *483 of Charles M. Silas for participation in the Oneida Indian New York judgment fund ” and “ In the matter of the application of Charles M. Silas for participation in the Oneida Indian fund,” shall be enrolled by the commissioner hereinafter named as entitled to share in the distribution of the said fund, provided he can establish the fact that he was a member of the Oneida tribe at the date of the treaty of Buffalo Creek, or a descendant of such person; or that he was affiliated or associated with the Oneidas at the date of the execution of said treaty, or is the descendant of persons who were so affiliated or associated: Provided further, he can establish that since the execution of the said treaty he has not become affiliated with any other tribe or tribes than one of the tribes comprising the New York Indians: And provided further, he can establish that he presented his claim to share in the said fund to the Secretary of the Interior prior to December 31,1901.
20. It is further adjudged, ordered, and decreed that no person shall be enrolled in more than one of the said tribes of New York Indians, nor shall any one person in his own right receive more than one share of the fund arising from said judgment. And if it shall appear that any one of the claimants applying to be enrolled under the provisions of this decree was one of the thirty-two Indians who received allotments of land in the New York Indian reservation in Kansas, or is a descendant of any one of said thirty-two allottees, or is a member of the Tonawanda Band of Senecas, or is a descendant of a member of the said Tonawanda Band, then said claimant shall not be enrolled as entitled to share in the fund arising from said judgment as aforesaid.
21. Nothing in this decree shall be understood or construed to affect the right of membership in the several tribes of the New York Indians as now constituted and recognized by the Department of the Interior, or to relate to tribal property or funds other than the fund arising from the judgment aforesaid.
22. It further appearing to the court that the- New York Indians who were parties to the said treaty of Buffalo Creek of January 15, 1838, although consisting of nine tribes, were *484 nevertheless one general community, or confederation; and it further appearing that the grant of the Kansas lands made .by the second article of said treaty was of the entire tract en bloc; and it further appearing that the purpose and intention of said treaty, in the event that said lands should be allotted in severalty, was to provide for the individuals of each tribe' allotments of land equal to the allotments to be received by the individuals of each of the other tribes; and it further appearing that no. division or partition of said lands was ever made between the said several tribes of New York Indians, but that the title to the whole of said tract continued to be held en bloc up to the time of the opening of said lands to settlement by the order of the President in 1860; and it further appearing that no division or apportionment of the claim of said Indians against the United States was ever made among the several tribes; and it further appearing that justice and right would require that each individual entitled to share in the fund arising from said judgment should receive an equal share of the said fund, it is therefore further adjudged, ordered, and decreed that all of said funds remaining for distribution among the individual beneficiaries of said fund, after the payment of all expenses as provided in this decree, shall be distributed by the Secretary of the Treasury, share and share alike, to each person heretofore enrolled by the Secretary of the Interior as entitled to share in said fund as members of the Seneca, Cayuga, Onondaga, Tuscarora, Oneida, St. Regis, and Brothertown tribes, and to each additional person who shall finally be enrolled and held to be entitled to share in said fund under the provisions of this decree, so that each person participating as a New York Indian in said fund shall receive the same amount.
23. It is further adjudged, ordered, and decreed that the shares of persons who have died since December 31, 1901; shall be paid to their next of kin or personal representative, and the shares of minors under 21 years of age and persons non compos shall be paid to their respective parents or legal guardians having the charge and custody of the persons and property of said parties.
*485 24. It being represented to the court by the honorable Secretary of the Interior that it is desirable (to facilitate a final adjustment of this case) that the court shall appoint a commissioner who shall discharge the duties heretofore performed by the special agent appointed by the Secretary of the Interior in making up the rolls of Indians entitled to participate in the judgment heretofore rendered in this action, it is therefore further adjudged, ordered, and decreed that Guión Miller be, and he is hereby, designated and appointed a special commissioner of this court to prepare a roll of all persons entitled under the terms and conditions of this decree to share as members of the said several tribes of New York Indians in the fund arising from the judgment aforesaid in addition to those who have already been enrolled by the Secretary of the Interior. Said commissioner shall have power to summon witnesses, administer oaths, and do everything needful for the proper discharge of his duties as herein set forth. He shall have power to appoint one clerk as stenographer and typewriter, whose compensation shall be at the rate of $100 per month while actually employed, and in addition he shall'have power to appoint one clerk when engaged in his investigations in the fieldj such clerk to Receive as compensation the sum of $5 per day while actually engaged in the discharge of his duties in addition to his necessary traveling expenses.
Said commissioner shall receive as compensation, in addition to his necessary traveling expenses when actually engaged in investigation in the field, $300 per month.
25. The records of the Department of the Interior so far as they relate to the subject-matter of these proceedings shall be accepted by said commissioner as a part of the record of this case, and all matters of fact ascertained and determined by the- Secretary of the Interior in the consideration of the applications made for participation in the fund arising from said judgment shall be accepted and acted upon by said commissioner as fully and correctly established and determined, except Avhere it may be shown that a mistake of fact has been committed.
26. In the investigation of such material facts as have not *486 been determined by the Secretary of the Interior said commissioner shall proceed to such points in the United States and Canada as he may find it necessary and expedient and make a special investigation in the field; and in. the cases of claimants residing in Canada he may, in his discretion, upon due notice given to said claimants or their attorneys, require said claimants, or their attorneys, to appear before him at some convenient place or places within the jurisdiction of the United States and there produce witnesses or other competent proof to establish their respective claims. And the attorneys of all the parties in interest shall, as far as possible, be duly notified when and where such hearings are to take place.
27. It is further adjudged, ordered, and decreed that all the expenses incurred in carrying into effect the provisions of this decree, together with the expenses already incurred in making publication of said order of January 3, 1905, shall, upon the proper certificate made under oath by said commissioner and duly approved by the court, be paid by the Secretary of the Treasury out of said appropriation made by the act of Congress of February 9, 1900, to pay said judgment in favor of the New York Indians as aforesaid.
28. And it further appearing to the court that no objections have been filed to the right of any of the individuals enrolled by the Secretary of the Interior as entitled to participate in the fund arising from said judgment, except in the case of 181 members of the Stockbriclge and Munsee Indians, to wit, Percy Aaron and 180 others, referred to in subdivision 2 hereinbefore stated; and it further appearing that no objections have been made to a partial pajnnent being made to individuals so enrolled as aforesaid and unob-jected to; and it further appearing that a partial advance payment of $100 can be safely made to each of the individuals of said tribe so enrolled as aforesaid; and it being represented to the court that such pajunent is deemed desirable by the Secretary of the Interior at this time, it is therefore adjudged, ordered, and decreed that the Secretary of the Treasuiy be. and he is hereby, authorized and directed to pay to each individual New York Indian so enrolled as *487 aforesaid by the Secretary of the Interior, except the 181 members of the Stockbridge and Munsee tribe set forth and referred to in subdivision 2 hereinbefore set forth, the sum of one hundred dollars ($100) out of the said appropriation made by the act of Congress of February 9, 1900, to pay said judgment in favor of the New York Indians. Such advance shall be deducted from the share of said individuals as finally determined after the completion of the enrollment hereinbefore provided for.
29. When the roll of persons entitled to participate in the fund shall have been made and certified to the court by the commissioner as hereinbefore provided, it shall, upon due notice to the parties, be submitted to the court for its approval, and when so approved shall be certified by the clerk of this court to the Secretary of the Treasury for payment to the persons named therein, together with the persons named on the rolls heretofore made up and approved by the Secretary of the Interior of the members of said several tribes of New York Indians entitled to share in said fund as aforesaid.
30. It is further adjudged, ordered, and decreed that nothing herein provided shall in any way impair or prejudice any agreement or contract between any of the parties in this case and their attorneys or counsel for remuneration for services rendered in the prosecution of the claims which are the subject of this suit.
31. It is further adjudged, ordered, and decreed that all New York Indians who, prior to December 31, 1901, filed applications before the Secretary of the Interior to be enrolled as members of any one of the several tribes of New York Indians shall be considered as applicants for enrollment by the commissioner hereinbefore named, provided said parties have filed petitions herein, or shall file such petition or petitions in this court on or before July 31,1905, unless the court shall extend the time for cause shown, and shall be enrolled for participation in the fund arising from said judgment, provided they shall establish the fact that'they were members of some one of the tribes of New York Indians at the date of the execution of the treaty of Buffalo Creek, January 15, 1838, or that they are descendants of such persons, or that *488 they were affiliated or associated with one of said tribes at the time of the execution of said treaty, or are descendants . of persons who were so affiliated or associated, and further establish the fact that since said date'of 1838 they have not affiliated with any tribe of Indians other than one of the tribes of New York Indians parties to said treaty.

'Names of individual members of the Stoelcbridge and Munsee tribe enrolled by the Secretary of the Interior as entitled to share in the fund arising from the judgment in favor of the New York Indians to whom objections have been made, referred to in subdivision 2 of the decree of the court of May 18, J905; and who are inhibited from receiving a partial advance payment of $100 under the provisions of subdivision 28 of said decree.

*489 Is ames of -individual members of the Stoclcbri&ge and Mimsee tribe, etc. — Conti lined.