Peelle, Ch. J.,
delivered the opinion of the court:
The question now arises on the application of the Seneca Nation of Indians and the Onondaga, Cayuga, and Tuscarora tribes of Indians for an appeal from the decrees of the court entered herein May 18, 1905, and May 7, 1906, respecting the persons entitled to share in the judgment rendered in said cause November 22,1898, for the sum of $1,998,744.46, on the mandate of the Supreme Court reversing the judgment of this court (170 U. S. R., 1; 173 id., 466).
The cause was prosecuted under the special act of January 28, 1893 (27 Stat. L., p. 426), conferring jurisdiction on the court “ to hear and enter up judgment ” against the United States in favor of “ the New York Indians, being those Indians who were parties to the treaty of Buffalo Creek, on the fifteenth of January, eighteen hundred and thirty-eight.”
In accordance with the terms of that statute, the action was commenced and prosecuted in the name of “ The New York Indians,” parties to the treaty of Buffalo Creek, and judgment was rendered accordingly, and an appropriation has been made to pay the same.
In finding i of the original case, appealed to the Supreme Court, it was found that the New York Indians, as they existed at the time of said treaty, were “ Senecas, Onondagas, Onondagas residing on the Seneca Reservation, Onondagas *464 at Onondaga, Cayugas, Cayugas residing on the Seneca Reservation, Cayugas residing in the State of New York, Tuscaroras, Tuscaroras residing in the State of New York, Oneidas residing in New- York, at Green B,ay (Wis.), and on the Seneca Reservation, Oneidas, St. Regis, St. Regis in Now York, the American party of the St. Regis residing in the State of New York, Stockbridges, Munsees, Brothertowns,” and they were so regarded by the Supreme Court.
Thereafter, by the act of March 3, 1901 (31 Stat. L., pp. 1058, 1077), making appropriations for the current and contingent expenses of the Indian Department, the Secretary of the Interior was authorized and directed to withhold from the amount appropriated to pay said judgment a sum-not exceeding $10,000, to be applied “ in the payment of expenses necessary in ascertaining the beneficiaries of said judgment.” And by the act of April 21, 1904 (33 Stat. L., pp. 189, 208), the further sum of $5,000 was authorized and directed to be withheld by the Secretary for the like purpose.
In the execution of the authority thus conferred the Secretary of the Interior caused to be made a roll of those Indians whom he ascertained to be “ the beneficiaries of said judgment,” excluding from said roll, among others, the Oneida Indians, parties to said treaty, who, about four years subsequent thereto, migrated to Canada, where they, have since resided. Their exclusion from the roll was upon the ground that the judgment or fund to be distributed was communal, as well as the Kansas land for the value of which the judgment had been rendered, and that by their removal to Canada they had forfeited all rights to said lands. Pb-jection being made .to their exclusion, the Secretary transmitted their case to the court under section 2 of the act of March 3, 1883, known as the Bowman Act, for the action of the court thereunder for his guidance and action.
Others Avho claimed to be entitled to share in said judgment were also denied enrollment by the Secretary for various reasons, and they as well as said Oneidas voluntarily .appeared in this court and filed their respective petitions invoking the equity power of the court to determine the question respecting their right to share in the distribution of the fund so appropriated to pay said judgment.
*465 The Secretary, in preparing the roll under the authority given to him as aforesaid, caused notice to be given by three months’ publication in newspapers published in New York, Wisconsin, Missouri, and Kansas, and in the Indian and Oklahoma Territories,-and as well by posters distributed to Indian agents and postmasters throughout the same region, to all persons claiming to be entitled to share in the fund arising from said judgment, to file their applications therefor in the office of the Commissioner of Indian Affairs on or before December 31, 1901, that being the date fixed by the Secretary when the enrollment of the beneficiaries should be made, after which no further applications would be received.
In like manner, after those refused enrollment by the Secretary had filed their respective petitions in this court, an order was entered on the 3d day of January, 1905,' among other things directing “ that all individuals, groups, or bands of claimants who have not been enrolled by the Secretary of the Interior as entitled to share in the distribution of the fund arising from the judgment of the Court of Claims of November 22, 1898, in favor of the New York Indians, appear in this court on the 3d day of April, 1905, at the convening thereof, either in person or by counsel, and show cause why their names should be enrolled for participation in the distribution of said fund, and if any of said individuals, groups, or bands then neglect or fail to appear, they shall be adjudged to have waived and forfeited all right to share in said fund.”
The order so issued was published once each week for a period of four weeks before the 3d day of March, .1905, in various newspapers published in the States of Missouri, New York, and Wisconsin, as stated in said order.
Thereafter, on the 18th day of May, 1905, the several petitions, and answers thereto, and motions respecting various subjects being heard by the court, a decree was entered reciting the action of the Secretary, confirming the roll made by him, except as to 181 members of the Stockbridge and Mun-see Indians, as therein stated, together with the conclusion of the court respecting the rules under which further enrollments would be permitted, as therein stated, and as more *466 particularly set forth in the opinion of the court. (40 C. Cls. R., 448.)
The decree, for the reasons set forth in the opinion, provided for the enrollment of the Oneidas, of Canada, and specifically provided the rules under which other applicants would be- entitled to enrollment.
Except as to the 181 members of the Stockbridge and Munsee tribes of Indians, as set forth in paragraph 28 of said decree, no objection was made by anyone to the enrollment made by the Secretary, nor was any objection made to the payment of $100 each to those so enrolled. The Secretary of the Interior, as well as the parties in interest, were desirous that a partial payment should be made, and it was so ordered and such payments were made, and the members of the nation and tribes applying herein for appeal were each paid $100. The total amount so paid to the several individuals enrolled by the Secretary amounted in the aggregate to about $800,000, leaving still for distribution a little over $1,000,000, or perhaps $100 additional to those already paid, and about $200 each to those enrolled under the decree of the court.
Looking to the enrollment of those entitled under the decree to share in the fund, the court appointed Guión Miller, esq. (who had served under the Secretary of the Interior for the like purpose), a commissioner “ to prepare a roll of. all persons entitled under the terms and conditions of this decree to share as members of the said 'several tribes of New York Indians in the fund arising from the judgment aforesaid, in addition to those who have already been enrolled by the Secretary of the Interior.” Tlio commissioner was given power to summon witnesses, administer oaths, and do everything needful for the proper discharge of his duties as set forth in the decree.
The commissioner, after nearly a year of careful, painstaking work, made his reports to the court, together with the evidence upon which he relied for his action. Exceptions were filed to said reports, which were elaborately argued by the counsel for all the parties, and the court, after mature consideration, did on May 7,1906, overrule all the exceptions filed to said commissioner’s reports; confirmed the reports of *467 the commissioner, and finally decreed that all members of the Stockbridge and Munsee tribes enrolled by the Secretary, with a single exception, be enrolled; that other applicants, including the Oneiclas of Canada, recommended for enrollment by the commissioner be enrolled in addition to those so enrolled by the Secretary of the Interior — all of which was in conformity with the decree in said cause.
In the latter decree it was, in the twelfth paragraph thereof, provided “ that the decree of May 18, 1905, be, and the same is hereby, reaffirmed and made a part of this, the final decree in this cause.”
The decree of May 18, 1905, was in the nature of an interlocutory decree, its finality depending upon the action of the court on the reports of the commissioner when made. By the terms of the last decree (May 7, 1906) the decree of May 18, 1905, is made a part thereof as the final decree in the cause.
The lands in Kansas for the value of ivhich the judgment was rendered were, by the terms of the treaty of 1888, set apart “ for .a permanent home for all the New York Indians,” in consideration of which the Indians relinquished all their right, title, and interest in the lands which had theretofore been secured to them at Green Bay, Wis.
The court (170 U. S. R., 19; 173 id., 465), after a full and careful review of the authorities, held that the grant of the Kansas lands “ ivas intended to invest a present legal title in the Indians ” of a defined tract described by metes and bounds, for the reason, among others, that the cession by the Indians of their lands in Wisconsin “ was an absolute, unconditional, and immediate grant,” and, further, that the special provisions of the treaty (art. 10) made for the Senecas and the Tuscaroras who had parted with certain lands in New York indicates an intention on the part of “ both the Government and the Indians that they should take immediate possession of the tract set apart for them in Kansas; ” that while the third article of the treaty created a condition subsequent, upon the breach of which the Government might declare a forfeiture, the same could not be done by “ simple executive action to reenter, take possession of the lands, and sell them,” as was done, without legislative or judicial sanction. Hence, notwithstanding the protest of the Indians *468 and their final refusal to remove to said lands in 1846 — no time having been fixed by the President for the removal— they were held entitled to recover for the value of the lands so taken possession of and sold.
As before stated, the court found as a fact who constituted the New York Indians at the time of the treaty of 1838, and they and their descendants coming within the rules announced have been enrolled and are entitled to share per capita in the fund arising from the judgment.
If we should assume that the applicants herein for appeal still maintain their tribal organizations, still there is no provision by which the tribes as such can recover any portion of the fund, and hence no pro^vision for an appeal by a nation or tribe. The amount involved precludes an appeal by thé individual! Upon what theory, then, can the ration and tribes of Indians, whose organizations as such ceased long-before the passage of the jurisdictional act and for whom as tribes no provision is made for payment of any portion of the judgment, appeal? This is the question confronting us, and we have reviewed the case from its beginning for the purpose, if possible, of getting at the correct solution of the question.
The jurisdictional act authorized an appeal by either party, i. e., by the United States or the New York Indians, and from the judgment of this court dismissing the petition an appeal was taken by the New York Indians, and the judgment, as before stated, was reversed.
It is contended by those opposing the appeal that in respect thereto the jurisdictional act has performed its office; that the right of appeal given by that act was as between the United States and the New York Indians and not the United States and portions or subdivisions of said Indians.
And, further, that as the right of appeal is a statutory one, and there is no other than the jurisdictional act, an appeal will not lie from the order or decree of the court directing to whom its judgment shall be paid.,
On the other hand, the applicants for appeal contend that the treaty of 1838 was between the tribes composing the Six Nations of New York Indians, and that the jurisdictional statute should be construed in harmony therewith.
*469 The answer to this latter contention is that the canses of action in this case are, as has been said, individual. There is no body politic or body corporate which is a party to the suit, or a party in interest. To prevent multiplicity ■ of actions, Congress authorized one suit to be brought, which should, in legal effect, embrace and represent all individual claimants. As none of these individual claimants would have a right of appeal because of the insignificance of the amount involved, Congress granted, with jurisdiction, a right of appeal to all the claimants collectively. But this was for the purpose of reviewing and determining the legal issues between the Indians on the one hand and the United'States on the other. The present attempt to appeal involves no such issue. The United States will have no right or interest involved in the proposed appeal. The issues will be simply between individual Indians; and instead of the amount in controversy of any individual Indian seeking to appeal being $3,000, it will not be a tenth part of-that amount. There are frequently class cases in this court, cases where the facts are similar or identical, and only the parties are different; and it woukl.not help the claimant to appeal in one such case for him to say that while the amount involved in his case is less than $3,000 there are a number of other cases just like his which, in the aggregate, will amount to more than $3,000. Here there is one suit instead of many, but the causes of action are several and individual. No controversy exists between the United States and any one of these claimants, and the amount involved, if an appeal should be .allowed, will not equal $3,000 in any single case.
The language of the jurisdictional act, that “ from any judgment rendered by the. court either party may appeal,” must in respect to the amount involved be construed in harmony with the general law applicable to appeals.
The members of the nation and tribes now applying for the allowance of an appeal were held entitled to share in the judgment, and they were paid about one-half of the amount due each. These payments were made after and in conformity with the decree of May 18, 1905, wherein provision was made for the enrollment of all who were enrolled, so that at and before the time of said payments the applicants
*470 for appeal bad due notice from the decree not only that the Oneidas of Canada were to be enrolled, but as to all the rules which were to govern other enrollments.
As the enrollment is of the individuals and not of tribes or nations, and the amount clue each will not be more than perhaps $200, an appeal will not lie in favor of one person even if such person had not theretofore shared in the judgment as aforesaid; and as there is no enrollment of tribes or ‘ nations, or any provisions for nations or tribes as such to share in the judgment, they can not be said to be aggrieved, and hence their applications for appeal must be denied, which is accordingly done.