The ONEIDA INDIAN NATION OF NEW YORK STATE et al., Plaintiffs-Appellees,

v.

The COUNTY OF ONEIDA et al., Defendants,

The County of Madison, Petitioner-Appellant.

No. 667, Docket 79–7685.

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1980.

Decided May 1, 1980.

---

Arlinda F. Locklear, Washington, D. C. (Native American Rights Fund, Washington, D. C., Lawrence A. Aschenbrenner, Washington, D. C., of counsel), Bertram E. Hirsch, Bellerose, N. Y., for plaintiffs-appellees.

Allan Van Gestel, Boston, Mass. (Goodwin, Procter & Hoar, Tobin N. Harvey, Boston, Mass., and William L. Burke, Hamilton, N. Y., of counsel), for petitioner-appellant.

Before MOORE, MULLIGAN and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This appeal presents another chapter in a long and complicated litigation which is detailed in the opinion of the Supreme Court, *Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), and in Judge Edmund Port's later decision on remand, reported at 434 F.Supp. 527 (N.D.N.Y.1977). Rather than repeat the historical background and legal issues involved we assume familiarity with these opinions and limit our discussion to the narrow question presented on this appeal.

I

The Oneida Indian Nations of New York and Wisconsin (Oneida Nations) brought two actions against the Counties of Madison and Oneida in the United States District Court for the Northern District of New York in 1970 and 1974.[1] The gravamen of the complaints was that certain sales of land by the Oneida Nations pursuant to treaties with the State of New York in the period from 1795 to 1842 were void by reason of the failure of the State to comply with the Indian Trade and Intercourse Act, 1 Stat. 137, enacted in 1790 and now codified in 25 U.S.C. § 177.[2] That Act prohibits the conveyance of Indian lands without the consent of the United States and invalidates transfers made without federal approval. The plaintiffs alleged in the district court that the United States had consented to none of the cessions covered by the treaties with New York and that the Oneida Nations were entitled to damages for the Counties' use and occupancy of the land. These actions are more fully described in the margin.[3]

1. The plaintiffs in the 1970 action amended their complaint to add the Oneidas of the Thames Band Council, a band from Ontario, Canada, as plaintiffs.

2. The Act provides:
   No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

3. The complaint in the 1970 action concerned solely a 1795 transaction, and alleged that the price paid by New York for that land was inadequate and unconscionable. It sought

The Oneida Nations had previously instituted proceedings in 1951 against the United States before the Indian Claims Commission (ICC) which included the same land and treaties now involved in the district court proceedings. The theory of the ICC proceedings was that, by virtue of the Trade and Intercourse Act, the United States owed a fiduciary duty to the Oneida Nations to protect them against unfair dealings by third parties when disposing of their lands. The Nations charged that the United States had breached that duty in that the consideration received for the sales to New York was grossly inadequate and unconscionable. The Nation sought the fair market value of the land of which they were deprived by the treaties. The ICC determined that the United States was under an obligation to the Oneida Nations to assure that they received conscionable consideration. Questions of value and consideration, however, were reserved for further proceedings. *Oneida Nation of New York v. United States*, 26 Ind.Cl.Comm. 138 (1971). The United States appealed this determination to the Court of Claims, which held that *scienter* on the part of the federal government was a prerequisite to its liability. The Court affirmed the ICC as to two treaties at which the United States did have representatives, but remanded for a deter-

mination of the Government's knowledge, actual or constructive, of 23 treaties where no United States representatives were present. *United States v. Oneida Nation of New York*, 477 F.2d 939, 201 Ct.Cl. 546 (1973).[4]

The ICC's determination on the *scienter* issue was deferred pending settlement negotiations between the Oneida Nations and the United States. They proved to be fruitless. On September 22, 1978 the ICC found that the Government had constructive knowledge of all 23 treaties and probably had actual knowledge of most of them. *Oneida Indian Nation of New York v. United States*, 43 Ind.Cl.Comm. 373, 375. The liability of the United States still depends, however, upon whether the Oneida Nations received conscionable consideration under the treaties with New York. The ICC ceased to exist on September 30, 1978, eight days after its *scienter* decision was rendered. Jurisdiction over pending cases was then assumed by the Court of Claims pursuant to 25 U.S.C. § 70(v). The questions of adequacy of consideration and damages are still pending in the Court of Claims.

In March, 1979 Madison County filed two identical motions for summary judgment in the district court in the 1970 and 1974 actions. The County urged that the ICC's

damages of at least $10,000 as compensation for the defendants' use and occupancy of the site from 1968 through 1969. The 1974 complaint attacked the validity of the 1795 transfer and other cessions to New York from that date through 1842. That complaint also requested damages of at least $10,000 and an accounting to determine the fair rental value for the defendants' use and occupancy of the parcels from 1951 until such time as they are returned to the plaintiffs.

The 1970 action has proceeded to the trial stage. In 1977 Judge Port held that the defendants were liable to the Oneidas for their use and occupancy of the land in question during the years 1968–69. *Oneida Indian Nation of New York v. County of Oneida*, 434 F.Supp. 527 (N.D.N.Y.1977). The issues of damages and the scope of relief have not yet been determined. *Id.* at 548. The second action has remained dormant since its filing in 1974, awaiting the outcome of the first suit.

4. In its entirety the Oneida Nation's ICC suit against the United States covered 27 treaties of cession with New York between 1785 and 1846.

As noted above, the ICC held that the United States had knowingly breached its fiduciary duty under the Trade and Intercourse Act to oversee 25 of those cessions occurring between 1795 and 1846. The other two cessions took place in 1785 and 1788, before the effective date of the Trade and Intercourse Act in 1790. In 1978 the Court of Claims affirmed the ICC's decision that the United States had breached a fiduciary duty to the Indians as to these earlier transactions. That fiduciary duty arose from the Treaty of Fort Stanwix of October 22, 1784, in which the United States agreed to secure the "Oneida and Tuscarora nations . . . in the possession of the lands on which they are settled." *United States v. Oneida Nation of New York*, 576 F.2d 870, 872 n.2, 875 & n.10 (Ct.Cl.1978).

The Treaty of Fort Stanwix is not mentioned in Madison County's ratification argument because the instant action concerns only those treaties entered into from 1795 through 1842.

September 22, 1978 holding that the United States had knowledge of the treaties and would be liable to the Oneida Nation if in fact inadequate consideration had been received, constituted an implied congressional ratification of New York's ownership of the lands under the treaties so as to satisfy the Trade and Intercourse Act. Noting that ratification under the Act may be retroactive, *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 912, 915 (1965), the County argued that this implicit approval operated to vest title in the State *ab initio.* Therefore, it concluded, the action for damages for unlawful trespass against the Counties should be dismissed. We note that whether or not the cessions to New York extinguished the Oneida Nation's title to the lands was not before the ICC and was expressly avoided in its decision. *Oneida Nation of New York v. United States, supra,* 43 Ind.Cl.Comm. at 407.

Judge Port entered an order on May 17, 1979 which denied Madison County's motion for summary judgment in all respects. He found that the ICC decision did not constitute a ratification of the treaties in question. However, pursuant to 28 U.S.C. § 1292(b), Judge Port certified that the order involved a controlling question of law which may materially advance the termination of the litigation in issue. The question so framed reads:

> "Does a final decision of the Indian Claims Commission that the United States 'will be liable under the Indian Claims Commission Act and the Trade and Intercourse Act if the Oneida Indians did not receive conscionable consideration under any of the aforementioned treaties', *Oneida Indian Nation of New York v. United States,* 43 Ind.Cl.Comm. 373, 467 (1978) (No. 301, Claims 3 and 7), constitute consent or ratification by the Congress of said treaties?"

On September 26, 1979 the County's petition for leave to appeal was granted by a panel of this court including Judges Mulligan and Meskill. Issues not previously raised or considered, however, compel the conclusion that the petition was improvidently granted, and we therefore dismiss the appeal.

II

The premise of the certified question is explicit: that the decision of the ICC is final. It is quite apparent that the decision is interlocutory since there has been no resolution of the adequacy of the consideration received or the amount of damages to be recovered. More importantly, the ICC's *scienter* holding, which is essential to a finding of liability on the part of the United States, has not been appealed to the Court of Claims or reviewed by the Supreme Court. Prior to the ICC's expiration, such an interlocutory determination could have been appealed to the Court of Claims within three months of the decision. 25 U.S.C. § 70s(b). The United States did not elect to do so. Appellant concedes, however, that such interlocutory appeal was not mandatory, since section 70s(b) also provides:

> "That the failure of either party to appeal from any such interlocutory determination shall not constitute a waiver of its right to challenge any such interlocutory determination in any appeal from any final determination subsequently made in the case."

Findings of fact are expressly made appealable as well as conclusions of law.

The County argues that the right of final appeal under section 70s(b) is no longer available to the United States because of the language of 25 U.S.C. § 70v–3(d). That section was enacted to govern the appellate review of cases transferred to the Court of Claims upon the termination of the ICC. The section states:

> (d) Cases transferred to the United States Court of Claims pursuant to this chapter, shall be thereafter subject to review by the Supreme Court in accordance with the provisions of section 1255 of Title 28: *Provided,* That any decision of the Commission rendered in a case prior to its transfer, which could have been appealed pursuant to the provisions of section 70s of this title, shall be appealable to the Court of Claims subject to such provisions: *Provided further,* That

such provisions shall not otherwise be applicable to transferred cases." (emphasis in original)

The first proviso seemingly supports the contention of the Oneida Nation of New York that the traditional option of an ICC litigant to take an interlocutory appeal or to appeal from a final judgment is preserved. The County relies on the second proviso which it construes to deprive the litigant of that option. It is not at all clear to us that the second proviso takes away the section 70s(b) right of final appeal.[5] If so it constitutes a significant departure from the existing practice, which we would be loath to accept absent a clearer signal from Congress, particularly in view of the general policy of discouraging interlocutory appeals. See Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3929 (1977). Moreover, it would be contrary to Court of Claims Rule 171(d)(2) which is analogous to section 70s(b) and provides that the failure to appeal an interlocutory ICC decision to the Court of Claims does not waive the right to challenge such interlocutory determination in any appeal from a final decision.[6]

We need not decide this question which is apparently of first impression at this juncture and we do not. The construction of these statutes involving the scope of appellate review is more fittingly determined by the Court of Claims. Suffice it to say that although the question certified assumes finality, the argument now raised by the Oneida Nations does raise a serious question as to the finality of the ICC decision. Inherent in the requirements of section 1292(b) is that the issue certified be ripe for

judicial determination. Wright, Miller, Cooper & Gressman, *supra*, § 3930 at 157. In *Paschall v. Kansas City Star Co.*, 605 F.2d 403, 406 (8th Cir. 1979), the court noted that "[t]he purpose of section 1292(b) is not to offer advisory opinions 'rendered on hypotheses which [evaporate] in the light of full factual development.'" In this case there is a reasonable possibility that on appeal, if any, the United States may eventually be held to have had no actual or constructive knowledge of the treaties in issue. The question of congressional approval would thus be mooted and the district court actions could continue even assuming the correctness of the County's ratification argument. Because the premise of the certified question may be destroyed, it is not yet ripe for review.

There is another factor here which prevents us from entertaining this appeal now. It is by no means probable that our determination of the certified question "may materially advance the termination" of the district court litigation. Obviously an affirmance by this court would not, since the case would then proceed to trial, but neither would a reversal. The Oneida Indian Nation of Wisconsin, a party to the ICC litigation which is now pending on the issue of consideration in the Court of Claims, has represented that if success in that court would bar a recovery in the district court action, it would have no choice but to withdraw its claim against the United States. The anticipated recovery in the Court of Claims is in its view small compared to the "vastly more valuable" claim made in the Northern District. A recovery of the difference between the time-of-transfer mar-

5. In a letter to the House Committee on Interior and Insular Affairs, the ICC, which presumably was well acquainted with the terms of the statute governing its demise, had this to say about § 70v–3(d):

Section [70v–3(d)] of H.R. 4585 provides that review by the Supreme Court of the transferred cases shall be the same as now provided by law for other decisions of the Court of Claims, but further provides that any decisions by the Commission made before transfer will be appealable to the Court of Claims *in the present manner provided by section 70s* of the Indian Claims Commission Act. (emphasis added)

H.R.Rep. 95–234 (Part 1), 95th Cong., 1st Sess. 6 (1977) U.S.Code Cong. & Admin.News p. 473. Although not explicit, this language gives some indication that all of the appealability provisions of § 70s apply to pre-transfer decisions by the ICC.

6. Rule 171(d)(2) reads:

Failure to perfect an appeal from an interlocutory determination shall not constitute a waiver of the party's right to challenge such interlocutory determination in any appeal from any final determination subsequently made in the case.

ket value of the lands conveyed almost 200 years ago and the consideration actually received would obviously be substantially less than trespass damages measured by allegedly unlawful twentieth century occupancy.

In sum, we are faced with a question that may well be mooted if the United States can and does successfully appeal in the Court of Claims. Even were we to reverse the district court's summary judgment order, the threat of one party to this litigation to withdraw its suit in the Court of Claims, which we do not consider unlikely, would in any event assure the continuation of the district court litigation, all other things remaining constant.[7]

For these reasons we are persuaded that the section 1292(b) certification was improvidently granted and dismiss the appeal.

---

7. "[V]oluntary dismissal of a suit leaves the situation so far as procedures therein are concerned the same as though the suit had never been brought . . . , thus vitiating and annulling all prior proceedings and orders in the case, and terminating jurisdiction over it for the reason that the case has become moot." *A. B. Dick Co. v. Marr*, 197 F.2d 498, 502 (2d Cir.), cert. denied, 344 U.S. 878, 73 S.Ct. 169, 97 L.Ed. 680 (1951); see *Hill v. W. Bruns & Co.*, 498 F.2d 565, 567 n.2 (2d Cir. 1974).