## CITY OF SHERRILL, NEW YORK *v.* ONEIDA INDIAN NATION OF NEW YORK ET AL.

No. 03-855.   Argued January 11, 2005—Decided March 29, 2005

198

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER,

JJ., joined.  SOUTER, J., filed a concurring opinion, *post*, p. 222.  STEVENS, J., filed a dissenting opinion, *post*, p. 222.

*Ira S. Sacks* argued the cause for petitioner.  With him on the briefs was *Esther S. Trakinski.*

*Caitlin J. Halligan*, Solicitor General of New York, argued the cause for the State of New York as *amicus curiae* urging reversal.  With her on the brief were *Eliot Spitzer*, Attorney General, *Daniel Smirlock*, Deputy Solicitor General, *Peter H. Schiff*, *Andrew D. Bing*, Assistant Solicitor General, and *Dwight A. Healy.*

*Michael R. Smith* argued the cause for respondents. With him on the brief were *William W. Taylor III, David A. Reiser, Thomas B. Mason, Richard G. Taranto*, and *Peter D. Carmen.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging affirmance.  With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Sansonetti, Deputy Solicitor General Kneedler, Deputy Assistant Attorney General Clark, William Lazarus, David C. Shilton*, and *Ethan G. Shenkman.**

---

*Briefs of *amici curiae* urging reversal were filed for Cayuga and Seneca Counties, New York, et al. by *Gus P. Coldebella, William L. Dorr, Daniel J. Moore*, and *Brian Laudadio;* for the Town of Lenox, New York, et al. by *Charles G. Curtis, Jr.*, and *E. Joshua Rosenkranz;* for the Counties of Madison and Oneida, New York, by *G. Robert Witmer, Jr., David M. Schraver, John J. Field III*, and *Randal B. Caldwell;* and for the Citizens Equal Rights Foundation by *Woodruff Lee Carroll.*

Briefs of *amici curiae* urging affirmance were filed for the Cayuga Nation of New York et al. by *Arlinda F. Locklear, Martin R. Gold, James T. Meggesto, Robert T. Coulter, Curtis G. Berkey, Marsha K. Schmidt, Carey R. Ramos*, and *Jeanne S. Whiteing;* for the Puyallup Tribe of Indians et al. by *Harry R. Sachse, Arthur Lazarus, Jr., Richard A. Guest, Thomas H. Shipps, John Howard Bell*, and *Peter C. Chestnut;* for the National Congress of American Indians by *Carter G. Phillips, Virginia A. Seitz, Mark E. Haddad*, and *Riyaz A. Kanji;* and for United South and Eastern Tribes, Inc., by *Ian Heath Gershengorn* and *Donald B. Verrilli, Jr.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns properties in the city of Sherrill, New York, purchased by the Oneida Indian Nation of New York (OIN or Tribe) in 1997 and 1998. The separate parcels of land in question, once contained within the Oneidas' 300,000-acre reservation, were last possessed by the Oneidas as a tribal entity in 1805. For two centuries, governance of the area in which the properties are located has been provided by the State of New York and its county and municipal units. In *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226 (1985) *(Oneida II)*, this Court held that the Oneidas stated a triable claim for damages against the County of Oneida for wrongful possession of lands they conveyed to New York State in 1795 in violation of federal law. In the instant action, OIN resists the payment of property taxes to Sherrill on the ground that OIN's acquisition of fee title to discrete parcels of historic reservation land revived the Oneidas' ancient sovereignty piecemeal over each parcel. Consequently, the Tribe maintains, regulatory authority over OIN's newly purchased properties no longer resides in Sherrill.

Our 1985 decision recognized that the Oneidas could maintain a federal common-law claim for damages for ancient wrongdoing in which both national and state governments were complicit. Today, we decline to project redress for the Tribe into the present and future, thereby disrupting the governance of central New York's counties and towns. Generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation. And at least since the middle years of the 19th century, most of the Oneidas have resided elsewhere. Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that

the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

# I

## A

OIN is a federally recognized Indian Tribe and a direct descendant of the Oneida Indian Nation (Oneida Nation), "one of the six nations of the Iroquois, the most powerful Indian Tribe in the Northeast at the time of the American Revolution." *Id.*, at 230. At the birth of the United States, the Oneida Nation's aboriginal homeland comprised some six million acres in what is now central New York. *Ibid.*; *Oneida Indian Nation of N. Y.* v. *County of Oneida*, 414 U. S. 661, 664 (1974) *(Oneida I)*.

In the years after the Revolutionary War, "the State of New York came under increasingly heavy pressure to open the Oneidas' land for settlement." *Oneida II*, 470 U. S., at 231. Reflective of that pressure, in 1788, New York State and the Oneida Nation entered into the Treaty of Fort Schuyler. For payments in money and kind, the Oneidas ceded to New York "all their lands." App. to Pet. for Cert. A136. Of the vast area conveyed, "[t]he Oneidas retained a reservation of about 300,000 acres," *Oneida II*, 470 U. S., at 231, "for their own use and cultivation," App. to Pet. for Cert. A137 (internal quotation marks omitted).[1] OIN does

---

[1] Under the "doctrine of discovery," *Oneida II*, 470 U. S. 226, 234 (1985), "fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States," *Oneida I*, 414 U. S. 661, 667 (1974). In the original 13 States, "fee title to Indian lands," or "the pre-emptive right to purchase from the Indians, was in the State." *Id.*, at 670; see *Oneida Indian Nation of N. Y.* v. *New York*, 860 F. 2d 1145, 1159–1167 (CA2 1988). Both before and after the adoption of the Constitution, New York State acquired vast tracts of land from Indian tribes

not here contest the legitimacy of the Fort Schuyler conveyance or the boundaries of the reserved area.

The Federal Government initially pursued a policy protective of the New York Indians, undertaking to secure the Tribes' rights to reserved lands. See *Oneida II*, 470 U. S., at 231–232; *Oneida I,* 414 U. S., at 667; F. Cohen, Handbook of Federal Indian Law 418–419 (1942 ed.); F. Cohen, Handbook of Federal Indian Law 73–74 (1982 ed.) (hereinafter Handbook). In 1790, Congress passed the first Indian Trade and Intercourse Act, commonly known as the Nonintercourse Act. Act of July 22, 1790, ch. 33, 1 Stat. 137. Periodically renewed, see *Oneida I*, 414 U. S., at 667–668, and n. 4, and remaining substantially in force today, see Rev. Stat. § 2116, 25 U. S. C. § 177, the Act bars sales of tribal land without the acquiescence of the Federal Government.[2] In 1794, in further pursuit of its protective policy, the United States entered into the Treaty of Canandaigua with the Six (Iroquois) Nations. Act of Nov. 11, 1794, 7 Stat. 44. That treaty both "acknowledge[d]" the Oneida Reservation as established by

---

through treaties it independently negotiated, without National Government participation. See Gunther, Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buffalo L. Rev. 1, 4–6 (1958–1959) (hereinafter Gunther).

[2] By its terms, the 1790 Nonintercourse Act governed Indian lands within the boundaries of the original 13 States. The Act provided "[t]hat no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, *or to any state, whether having the right of pre-emption to such lands or not,* unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." Act of July 22, 1790, ch. 33, § 4, 1 Stat. 138 (emphasis added). Our prior decisions state in this regard that, "[w]ith the adoption of the Constitution, Indian relations became the exclusive province of federal law." *Oneida II*, 470 U. S., at 234 (citing *Oneida I*, 414 U. S., at 670). See generally Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 Me. L. Rev. 17, 23–38 (1979) (discussing Indian relations under the Articles of Confederation and the Constitution).

the Treaty of Fort Schuyler and guaranteed the Oneidas' "free use and enjoyment" of the reserved territory. *Id.*, at 45, Art. II. The Oneidas in turn agreed they would "never claim any other lands within the boundaries of the United States." *Id.*, at 45, Art. IV.

New York State nonetheless continued to purchase reservation land from the Oneidas. The Washington administration objected to New York's 1795 negotiations to buy 100,000 acres of the Oneidas' Reservation without federal supervision. *Oneida II*, 470 U. S., at 229, 232. Later administrations, however, "[made not] even a pretense of interfer[ing] with [the] State's attempts to negotiate treaties [with the Oneidas] for land cessions." *Oneida Nation of N. Y.* v. *United States*, 43 Ind. Cl. Comm'n 373, 385 (1978); see also *id.*, at 390; Campisi, The Oneida Treaty Period, 1783–1838, in The Oneida Indian Experience: Two Perspectives 48, 59 (J. Campisi & L. Hauptman eds. 1988) (hereinafter Campisi). See generally Gunther 6 ("New York acquired much land from Indians through treaties—perhaps as many as 200—not participated in, though apparently known and not objected to, by the national government." (footnote omitted)).

The Federal Government's policy soon veered away from protection of New York and other east coast reservations. In lieu of the commitment made in the Treaty of Canandaigua, the United States pursued a policy designed to open reservation lands to white settlers and to remove tribes westward. D. Getches, C. Wilkinson, & R. Williams, Cases and Materials on Federal Indian Law 94 (4th ed. 1998) (After the Louisiana Purchase in 1803, federal policymakers "began to debate the tactics of inducing [eastern Indians] to exchange their remaining ancestral lands for a permanent territory in the West."). As recounted by the Indian Claims Commission in 1978, early 19th-century federal Indian agents in New York State did not simply fail to check New York's land purchases, they "took an active role . . . in encouraging the removal of the Oneidas . . . to the west."

*Oneida Nation of N. Y.*, 43 Ind. Cl. Comm'n, at 390; see *id.;* at 391 (noting that some federal agents were "deeply involved" in "plans . . . to bring about the removal of the [Oneidas]" and in the State's acquisition of Oneida land). Beginning in 1817, the Federal Government accelerated its efforts to remove Indian tribes from their east coast homelands. Handbook 78–79, and n. 142.

Pressured by the removal policy to leave their ancestral lands in New York, some 150 Oneidas, by 1825, had moved to Wisconsin. Horsman, The Wisconsin Oneidas in the Preallotment Years, in The Oneida Indian Experience, *supra*, at 65, 67. In 1838, the Oneidas and the United States entered into the Treaty of Buffalo Creek, which envisioned removal of all remaining New York Indians, including the Oneidas, to Kansas. Act of Jan. 15, 1838, 7 Stat. 550. By this time, the Oneidas had sold all but 5,000 acres of their original reservation. 337 F. 3d 139, 149 (CA2 2003). Six hundred of their members resided in Wisconsin, while 620 remained in New York State. 7 Stat. 556 (Sched. A).

In Article 13 of the Buffalo Creek Treaty, the Oneidas agreed to remove to the Kansas lands the United States had set aside for them "as soon as they c[ould] make satisfactory arrangements" for New York State's "purchase of their lands at Oneida." *Id.*, at 554. As a condition of the treaty's ratification, the Senate directed that a federal commissioner "fully and fairly explai[n]" the terms to each signatory tribe and band. *New York Indians* v. *United States*, 170 U. S. 1, 21–22 (1898). Commissioner Ransom H. Gillet, who had originally negotiated the treaty terms with the Oneidas, met with them again and assured them they would not be forced to move but could remain on "their lands *where they reside*," *i. e.*, they could "if they ch[ose] to do so remain *where they are* forever." App. 146 (emphases added).

The Oneidas who stayed on in New York after the proclamation of the Buffalo Creek Treaty continued to diminish in number and, during the 1840's, sold most of their remaining

lands to the State. *New York Indians* v. *United States*, 40 Ct. Cl. 448, 458, 469–471 (1905). A few hundred Oneidas moved to Canada in 1842, *id.*, at 458, and "by the mid-1840s, only about 200 Oneidas remained in New York State," Introduction to Part I, The Oneida Indian Journey: From New York to Wisconsin, 1784–1860, pp. 9, 13 (L. Hauptman & L. McLester eds. 1999). By 1843, the New York Oneidas retained less than 1,000 acres in the State. Campisi 61. That acreage dwindled to 350 in 1890; ultimately, by 1920, only 32 acres continued to be held by the Oneidas. *Ibid.*

The United States eventually abandoned its efforts to remove the New York Indians to Kansas. In 1860, the Federal Government restored the Kansas lands to the public domain, and sold them thereafter. *New York Indians,* 170 U. S., at 24, 28–29, 31.

B

Early litigation concerning the Oneidas' land claims trained on monetary recompense from the United States for past deprivations. In 1893, the United States agreed to be sued for disposing of the Kansas lands to settlers, and the Oneidas in New York shared in the resulting award of damages. See *New York Indians,* 170 U. S. 1; *New York Indians,* 40 Ct. Cl. 448 (identifying the Tribes qualified to share in the distribution of the sum recovered).

Seeking further compensation from the United States a half century later, the New York and Wisconsin Oneidas initiated proceedings before the Indian Claims Commission in 1951. *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 622 F. 2d 624, 626 (CA2 1980). They sought redress for lands New York had acquired through 25 treaties of cession concluded between 1795 and 1846. The Oneidas alleged, and the Claims Commission agreed, that under the Nonintercourse Act of 1790 and successor statutes, the Federal Government had a fiduciary duty to ensure that the Oneidas received from New York "conscionable consideration" for the lands in question. *Oneida Nation of N. Y.* v. *United States,*

26 Ind. Cl. Comm'n 138, 145 (1971). The Court of Claims affirmed the Commission's core determination, but held that the United States' duty extended only to land transactions of which the Government had knowledge. *United States* v. *Oneida Nation of N. Y.*, 201 Ct. Cl. 546, 554, 477 F. 2d 939, 944 (1973). Accordingly, the Court of Claims directed the Commission to determine whether the Government actually or constructively knew of the land transactions at issue. *Id.*, at 555, 477 F. 2d, at 945.

On remand, the Commission found that the Federal Government had actual or constructive knowledge of all of the treaties and would be liable if the Oneidas had not received conscionable consideration. *Oneida Nation of N. Y.*, 43 Ind. Cl. Comm'n, at 375, 406–407. The Commission anticipated further proceedings to determine the Federal Government's ultimate liability, but the Oneidas had by then decided to pursue a different course. On the Oneidas' request, the Court of Claims dismissed the proceedings. See *Oneida Nation of N. Y.* v. *United States*, 231 Ct. Cl. 990, 991 (1982) *(per curiam)*.

In lieu of concentrating on recovery from the United States, the Oneidas pursued suits against local governments. In 1970, the Oneidas of New York and Wisconsin, asserting federal-question jurisdiction under 28 U. S. C. § 1331 or § 1362, instituted a "test case" against the New York Counties of Oneida and Madison. They alleged that the cession of 100,000 acres to New York State in 1795, see *supra*, at 205, violated the Nonintercourse Act and thus did not terminate the Oneidas' right to possession under the applicable federal treaties and statutes. In this initial endeavor to gain compensation from governmental units other than the United States, the Oneidas confined their demand for relief. They sought only damages measured by the fair rental value, for the years 1968 and 1969, of 872 acres of their ancestral land owned and occupied by the two counties. The District Court, affirmed by the Court of Appeals, dismissed the Onei-

das' complaint for failure to state a claim arising under federal law. We reversed that determination, holding that federal jurisdiction was properly invoked. *Oneida I*, 414 U. S., at 675, 682.

In the next round, the Oneidas prevailed in the lower courts. On review in *Oneida II*, we rejected various defenses the counties presented that might have barred the action for damages, 470 U. S., at 240–250, and held that the Oneidas could maintain their claim to be compensated "for violation of their possessory rights based on federal common law," *id.*, at 236. While upholding the judgment of the Court of Appeals regarding the counties' liability under federal common law, we noted that "[t]he question whether equitable considerations should limit the relief available to the present day Oneida Indians was not addressed by the Court of Appeals or presented to this Court." *Id.*, at 253, n. 27. Accordingly, "we express[ed] no opinion as to whether other considerations m[ight] be relevant to the final disposition of this case." *Ibid.* On remand, the District Court entered a final judgment which fixed the amount of damages payable by the counties. Allowing setoffs for the counties' good-faith improvements to the land, the court ordered recoveries of $15,994 from Oneida County and $18,970 from Madison County, plus prejudgment interest. *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 217 F. Supp. 2d 292, 310 (NDNY 2002).

In 2000, litigation resumed in an action held in abeyance during the pendency of the test case. In that revitalized action, the Oneidas sought damages from Oneida and Madison Counties for a period spanning over 200 years. The amended complaint alleged that, through a series of agreements concluded during the years 1795 to 1846, approximately 250,000 acres of the Oneidas' ancestral land had been unlawfully conveyed to New York. *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 199 F. R. D. 61, 66–68 (NDNY 2000).

The Oneidas further sought to enlarge the action by demanding recovery of land they had not occupied since the 1795–1846 conveyances.[3] They attempted to join as defendants, *inter alia*, approximately 20,000 private landowners, and to obtain declaratory relief that would allow the Oneidas to eject these landowners. *Id.*, at 67–68.[4] The District Court refused permission to join the landowners so late in the day, resting in part on the Oneidas' bad faith and undue delay. *Id.*, at 79–85. Further, the court found the proposed amendment "futile." *Id.*, at 94. In this regard, the court emphasized the "sharp distinction between the *existence* of a federal common law right to Indian homelands," a right this Court recognized in *Oneida II*, "and how to *vindicate* that right." 199 F. R. D., at 90. That distinction "must be drawn," the court stated, *ibid.*, for in the two centuries since the alleged wrong, "development of every type imaginable

---

[3] In contrast, *United States* v. *Boylan*, 265 F. 165 (CA2 1920), involved land the Oneidas never left. *Boylan* concerned the 1885 conveyances by individual Oneida Indians of a 32-acre tract of reservation land to non-Indians. Despite the conveyances, a band of Oneidas continued to live on the land. After a non-Indian gained a state-court order ejecting the remaining Oneidas, the United States brought suit on behalf of the Oneidas to reclaim the land. The Second Circuit observed that the Oneidas were "actually in possession" of the 32 acres in question, *id.*, at 167, and had occupied the land continuously for over a century, *id.*, at 171. Given that occupation and the absence of Federal Government approval for the individual Oneidas' conveyances, the Second Circuit upheld the District Court's "decree restoring the ejected Indians to possession." *Id.*, at 173–174.

[4] In another lawsuit, commenced in 1978, the Oneidas sought from the State of New York and others both damages and recovery of land New York had purchased from the Oneidas in 1785 and 1788. *Oneida Indian Nation of N. Y.*, 860 F. 2d, at 1148. The Second Circuit affirmed the District Court's dismissal of that action, holding that treaties between New York and the Oneidas during the years in which the Articles of Confederation were operative did not require the assent of Congress. *Id.*, at 1167; see *supra*, at 203–204, n. 1.

has been ongoing," *id.*, at 92. Referring to the "practical concerns" that blocked restoration of Indians to their former lands, the court found it high time "to transcend the theoretical." *Ibid.* Cases of this genre, the court observed, "cr[ied] out for a pragmatic approach." *Ibid.* The District Court therefore excluded the imposition of any liability against private landowners. *Id.*, at 93–95.

This brings us to the present case, which concerns parcels of land in the city of Sherrill, located in Oneida County, New York. According to the 2000 census, over 99% of the population in the area is non-Indian: American Indians represent less than 1% of the city of Sherrill's population and less than 0.5% of Oneida County's population. U. S. Dept. of Commerce, Census Bureau, 2000 Census of Population and Housing, Summary Population and Housing Characteristics: New York, 2000 PHC–1–34, Table 3, p. 124 (July 2002), available at http://www.census.gov/prod/cen2000/phc-1-34.pdf (as visited Mar. 24, 2005, and available in Clerk of Court's case file). OIN owns approximately 17,000 acres of land scattered throughout the Counties of Oneida and Madison, representing less than 1.5% of the counties' total area. OIN's predecessor, the Oneida Nation, had transferred the parcels at issue to one of its members in 1805, who sold the land to a non-Indian in 1807. The properties thereafter remained in non-Indian hands until OIN's acquisitions in 1997 and 1998 in open-market transactions. See 337 F. 3d, at 144, n. 3. OIN now operates commercial enterprises on these parcels: a gasoline station, a convenience store, and a textile facility. *Id.*, at 144.

Because the parcels lie within the boundaries of the reservation originally occupied by the Oneidas, OIN maintained that the properties are exempt from taxation, and accordingly refused to pay the assessed property taxes. The city of Sherrill initiated eviction proceedings in state court, and OIN sued Sherrill in federal court. In contrast to *Oneida I*

and *II*, which involved demands for monetary compensation, OIN sought equitable relief prohibiting, currently and in the future, the imposition of property taxes.  OIN also sued Madison County, seeking a declaration that the Tribe's properties in Madison are tax exempt.  The litigation involved a welter of claims and counterclaims.  Relevant here, the District Court concluded that parcels of land owned by the Tribe in Sherrill and Madison are not taxable.  See 145 F. Supp. 2d 226, 254–259 (NDNY 2001).

A divided panel of the Second Circuit affirmed.  337 F. 3d 139.  Writing for the majority, Judge Parker ruled that the parcels qualify as "Indian country," as that term is defined in 18 U. S. C. § 1151,[5] because they fall within the boundaries of a reservation set aside by the 1794 Canandaigua Treaty for Indian use under federal supervision.  337 F. 3d, at 155–156; see *supra*, at 204–205.  The court further held that the Buffalo Creek Treaty did not demonstrate a clear congressional purpose to disestablish or diminish the Oneida Reservation.  337 F. 3d, at 161, 165; see *supra*, at 206.  Finally, the court found no legal requirement "that a federally recognized tribe demonstrate its continuous existence in order to assert a claim to its reservation land."  337 F. 3d, at 165.  In any case, the court held, the record demonstrated OIN's continuous tribal existence.  *Id.*, at 166–167.  Judge Van Graafeiland dissented as to the majority's primary holding.  In his view, the record raised a substantial question whether OIN had "forfeited" its aboriginal rights to the land because it abandoned "its tribal existence . . . for a discernable period of time."  *Id.*, at 171.

We granted the city of Sherrill's petition for a writ of certiorari, 542 U. S. 936 (2004), and now reverse the judgment of the Court of Appeals.

---

[5] Titled "Indian country defined," 18 U. S. C. § 1151 provides, in relevant part, that "the term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government."

## II

OIN and the United States argue that because the Court in *Oneida II* recognized the Oneidas' aboriginal title to their ancient reservation land and because the Tribe has now acquired the specific parcels involved in this suit in the open market, it has unified fee and aboriginal title and may now assert sovereign dominion over the parcels. Brief for Respondents 1, 12–19; Brief for United States as *Amicus Curiae* 9–10. When the Oneidas came before this Court 20 years ago in *Oneida II,* they sought money damages only. 470 U. S., at 229; see also *id.,* at 244, n. 16 (recognizing that the suit was an "action at law"). The Court reserved for another day the question whether "equitable considerations" should limit the relief available to the present-day Oneidas. *Id.,* at 253, n. 27; *supra,* at 209.[6]

"The substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is." D. Dobbs, Law of Remedies § 1.2, p. 3 (1973); see also *Navajo Tribe of Indians* v. *New Mexico,* 809 F. 2d 1455, 1467 (CA10 1987) ("The distinction between a claim or substantive right and a remedy is fundamental."). "[S]tandards of federal Indian law and federal equity practice" led the District Court, in the litigation revived after *Oneida II,* see *supra,* at 210–211, to reject OIN's plea for ejectment of 20,000 private landowners. *Oneida Indian Nation of N. Y.,* 199 F. R. D., at 90 (internal quotation marks omitted); *ibid.* ("[T]here is a sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right . . . ."). In this action,

---

[6] The United States acknowledged in its brief to the Court in *Oneida II* that equitable considerations unaddressed by the Court of Appeals in that suit might limit the relief available to the present-day Oneidas. Brief for United States as *Amicus Curiae* in *County of Oneida* v. *Oneida Indian Nation of N. Y.,* O. T. 1984, No. 83–1065 etc., pp. 33–40.

OIN seeks declaratory and injunctive relief recognizing its present and future sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations.[7] We now reject the unification theory of OIN and the United States and hold that "standards of federal Indian law and federal equity practice" preclude the Tribe from rekindling embers of sovereignty that long ago grew cold.[8]

The appropriateness of the relief OIN here seeks must be evaluated in light of the long history of state sovereign control over the territory. From the early 1800's into the 1970's, the United States largely accepted, or was indifferent to, New York's governance of the land in question and the validity *vel non* of the Oneidas' sales to the State. See generally Gunther 23–25 (attributing much of the confusion and conflict in the history of New York Indian affairs to "Federal inattention and ambivalence"). In fact, the United States' policy and practice through much of the early 19th century was designed to dislodge east coast lands from Indian pos-

---

[7] The dissent suggests that, compatibly with today's decision, the Tribe may assert tax immunity defensively in the eviction proceeding initiated by Sherrill. *Post,* at 225. We disagree. The equitable cast of the relief sought remains the same whether asserted affirmatively or defensively.

[8] We resolve this case on considerations not discretely identified in the parties' briefs. But the question of equitable considerations limiting the relief available to OIN, which we reserved in *Oneida II,* is inextricably linked to, and is thus "fairly included" within, the questions presented. See this Court's Rule 14.1(a) ("The statement of any question presented is deemed to comprise every subsidiary question fairly included therein."); *Ballard* v. *Commissioner, ante,* at 47, n. 2; *R. A. V.* v. *St. Paul,* 505 U. S. 377, 381, n. 3 (1992). See generally R. Stern, E. Gressman, S. Shapiro, & K. Geller, Supreme Court Practice 414 (8th ed. 2002) ("Questions not explicitly mentioned but essential to analysis of the decisions below or to the correct disposition of the other issues have been treated as subsidiary issues fairly comprised by the question presented." (internal quotation marks omitted)).

session. See *supra*, at 205–207. Moreover, the properties here involved have greatly increased in value since the Oneidas sold them 200 years ago. Notably, it was not until lately that the Oneidas sought to regain ancient sovereignty over land converted from wilderness to become part of cities like Sherrill. See *supra*, at 210–212; *Oneida II*, 470 U. S., at 264–265 (STEVENS, J., dissenting in part).

This Court has observed in the different, but related, context of the diminishment of an Indian reservation that "[t]he longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and in land use," may create "justifiable expectations." *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 604–605 (1977); accord *Hagen* v. *Utah*, 510 U. S. 399, 421 (1994) ("jurisdictional history" and "the current population situation . . . demonstrat[e] a practical acknowledgment" of reservation diminishment; "a contrary conclusion would seriously disrupt the justifiable expectations of the people living in the area" (internal quotation marks omitted)).[9] Similar justifiable expectations, grounded in two centuries of New York's exercise of regula-

---

[9] The Court has recognized that "only Congress can divest a reservation of its land and diminish its boundaries." *Solem* v. *Bartlett*, 465 U. S. 463, 470 (1984); see also 18 U. S. C. § 1151 (defining Indian country); *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 343 (1998) ("[O]nly Congress can alter the terms of an Indian treaty by diminishing a reservation."). The Court need not decide today whether, contrary to the Second Circuit's determination, the 1838 Treaty of Buffalo Creek disestablished the Oneidas' Reservation, as Sherrill argues. See Brief for Petitioner 31–39; *Oneida II*, 470 U. S., at 269, n. 24 (STEVENS, J., dissenting in part) ("There is . . . a serious question whether the Oneida did not abandon their claim to the aboriginal lands in New York when they accepted the Treaty of Buffalo Creek of 1838 . . . ."). The relief OIN seeks—recognition of present and future sovereign authority to remove the land from local taxation—is unavailable because of the long lapse of time, during which New York's governance remained undisturbed, and the present-day and future disruption such relief would engender.

tory jurisdiction, until recently uncontested by OIN, merit heavy weight here.[10]

The wrongs of which OIN complains in this action occurred during the early years of the Republic. For the past two centuries, New York and its county and municipal units have continuously governed the territory. The Oneidas did not seek to regain possession of their aboriginal lands by court decree until the 1970's. See *supra*, at 210, n. 4. And not until the 1990's did OIN acquire the properties in question and assert its unification theory to ground its demand for exemption of the parcels from local taxation. 337 F. 3d, at 144.[11] This long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the

---

[10] Citing *Montana* v. *Blackfeet Tribe,* 471 U. S. 759 (1985), *The Kansas Indians,* 5 Wall. 737 (1867), and *The New York Indians,* 5 Wall. 761 (1867), the dissent notes that only Congress may revoke the tax-exempt status of Indian reservation land. *Post,* at 224, and n. 3. Those cases, however, concerned land the Indians had continuously occupied. See Brief for Respondents in *Montana* v. *Blackfeet Tribe,* O. T. 1984, No. 83–2161, p. 3, and n. 1 (noting Indians' occupation of reservation); *Kansas Indians,* 5 Wall., at 738–742 (concerning Indians removed to and residing on Kansas lands before statehood); *New York Indians,* 5 Wall., at 768 (taxation by State would "interfer[e] with the possession, and occupation, and exercise of authority" by the Indians residing on the reservation). The Oneidas last occupied the parcels here at issue in 1805. See *supra*, at 211. The dissent additionally refers to *Cass County* v. *Leech Lake Band of Chippewa Indians,* 524 U. S. 103 (1998). *Post,* at 224, n. 3. But in that case, the Court held that an Indian tribe could not revive the tax-exempt status of its former reservation lands—which Congress had expressly removed from federal protection—by reacquiring the lands in the open market. 524 U. S., at 113–114.

[11] The fact that OIN brought this action promptly after acquiring the properties does not overcome the Oneidas' failure to reclaim ancient prerogatives earlier or lessen the problems associated with upsetting New York's long-exercised sovereignty over the area. OIN's claim concerns grave, but ancient, wrongs, and the relief available must be commensurate with that historical reality.

character of the properties, preclude OIN from gaining the disruptive remedy it now seeks.

The principle that the passage of time can preclude relief has deep roots in our law, and this Court has recognized this prescription in various guises. It is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief. See, *e. g., Badger* v. *Badger*, 2 Wall. 87, 94 (1865) ("[C]ourts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights." (internal quotation marks omitted)); *Wagner* v. *Baird*, 7 How. 234, 258 (1849) (same); *Bowman* v. *Wathen*, 1 How. 189, 194 (1843) ("[The] doctrine of an equitable bar by lapse of time, so distinctly announced by the chancellors of England and Ireland, . . . should now be regarded as settled law in this court.").

This Court applied the doctrine of laches in *Felix* v. *Patrick*, 145 U. S. 317 (1892), to bar the heirs of an Indian from establishing a constructive trust over land their Indian ancestor had conveyed in violation of a statutory restriction. In the nearly three decades between the conveyance and the lawsuit, "[a] large part of the tract ha[d] been platted and recorded as an addition to the city of Omaha, and . . . sold to purchasers." *Id.*, at 326. "[A]s the case stands at present," the Court observed, "justice requires only what the law . . . would demand—the repayment of the value of the [illegally conveyed] scrip." *Id.*, at 334. The Court also recognized the disproportion between the value of the scrip issued to the Indian ($150) and the value of the property the heirs sought to acquire (over $1 million). *Id.*, at 333. The sort of changes to the value and character of the land noted by the *Felix* Court are present in even greater magnitude in this suit. Cf. *Galliher* v. *Cadwell*, 145 U. S. 368, 373 (1892) ("[L]aches is not . . . a mere matter of time; but principally

a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.").

As between States, long acquiescence may have controlling effect on the exercise of dominion and sovereignty over territory. *Ohio* v. *Kentucky*, 410 U. S. 641, 651 (1973) ("The rule, long-settled and never doubted by this court, is that long acquiescence by one state in the possession of territory by another and in the exercise of sovereignty and dominion over it is conclusive of the latter's title and rightful authority." (quoting *Michigan* v. *Wisconsin*, 270 U. S. 295, 308 (1926))); *Massachusetts* v. *New York*, 271 U. S. 65, 95 (1926) ("Long acquiescence in the possession of territory and the exercise of dominion and sovereignty over it may have a controlling effect in the determination of a disputed boundary."). The acquiescence doctrine does not depend on the original validity of a boundary line; rather, it attaches legal consequences to acquiescence in the observance of the boundary. *California* v. *Nevada*, 447 U. S. 125, 131 (1980) (No relationship need exist "between the *origins* of a boundary and the legal *consequences* of acquiescence in that boundary. . . . Longstanding acquiescence by California and Nevada can give [the boundary lines] the force of law whether or not federal authorities had the power to draw them.").

This Court's original-jurisdiction state-sovereignty cases do not dictate a result here, but they provide a helpful point of reference: When a party belatedly asserts a right to present and future sovereign control over territory,[12] longstanding observances and settled expectations are prime considerations. There is no dispute that it has been two centuries since the Oneidas last exercised regulatory control over the properties here or held them free from local taxation.

---

[12] It bears repetition that for generations, the Oneidas dominantly complained, not against New York or its local units, but about "[mis]treatment at the hands of the United States Government." *Oneida II*, 470 U. S., at 269 (STEVENS, J., dissenting in part); see *supra*, at 207–208.

Parcel-by-parcel revival of their sovereign status, given the extraordinary passage of time, would dishonor "the historic wisdom in the value of repose." *Oneida II*, 470 U. S., at 262 (STEVENS, J., dissenting in part).

Finally, this Court has recognized the impracticability of returning to Indian control land that generations earlier passed into numerous private hands. See *Yankton Sioux Tribe* v. *United States*, 272 U. S. 351, 357 (1926) ("It is impossible . . . to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers . . . ."); *Felix*, 145 U. S., at 334 (observing, in declining to award equitable relief, "[t]hat which was wild land thirty years ago is now intersected by streets, subdivided into blocks and lots, and largely occupied by persons who have bought upon the strength of Patrick's title, and have erected buildings of a permanent character"). The District Court, in the litigation dormant during the pendency of *Oneida II*, see *supra*, at 209–211, rightly found these pragmatic concerns about restoring Indian sovereign control over land "magnified exponentially here, where development of every type imaginable has been ongoing for more than two centuries." *Oneida Indian Nation of N. Y.*, 199 F. R. D., at 92.

In this case, the Court of Appeals concluded that the "impossibility" doctrine had no application because OIN acquired the land in the open market and does not seek to uproot current property owners. 337 F. 3d, at 157. But the unilateral reestablishment of present and future Indian sovereign control, even over land purchased at the market price, would have disruptive practical consequences similar to those that led this Court in *Yankton Sioux* to initiate the impossibility doctrine. The city of Sherrill and Oneida County are today overwhelmingly populated by non-Indians. See *supra*, at 211. A checkerboard of alternating state and tribal jurisdiction in New York State—created unilaterally

at OIN's behest—would "seriously burde[n] the administration of state and local governments" and would adversely affect landowners neighboring the tribal patches. *Hagen,* 510 U. S., at 421 (quoting *Solem* v. *Bartlett,* 465 U. S. 463, 471–472, n. 12 (1984)). If OIN may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area. See *Felix,* 145 U. S., at 335 ("decree prayed for in this case, if granted, would offer a distinct encouragement to . . . similar claims"); cf. *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 433–437 (1989) (opinion of STEVENS, J.) (discussing tribal land-use controls); *post,* at 226, n. 6 (STEVENS, J., dissenting) (noting that "the balance of interests" supports continued state zoning jurisdiction).[13]

Recognizing these practical concerns, Congress has provided a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stakes in the area's governance and well-being. Title 25 U. S. C. § 465 authorizes the Secretary of the Interior to acquire land in trust for Indians and provides that the land "shall be exempt from State and local taxation." See *Cass County* v. *Leech Lake Band of Chippewa Indians,* 524 U. S. 103, 114–115 (1998). The regulations implementing § 465 are sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over

---

[13] Other tribal entities have already sought to free historic reservation lands purchased in the open market from local regulatory controls. See *Seneca-Cayuga Tribe of Okla.* v. *Aurelius, New York,* No. 5:03–CV–00690 (NPM), 2004 WL 1945359, *1–*3 (NDNY, Sept. 1, 2004) (tribe seeks declaratory and injunctive relief to avoid application of municipal zoning and land-use laws to 229 acres); *Cayuga Indian Nation of N. Y.* v. *Union Springs,* 317 F. Supp. 2d 128, 131–134, 147–148 (NDNY 2004) (granting declaratory and injunctive relief to tribe, to block application of zoning regulations to property—"located within 300 yards" of a school—under renovation by the tribe for use as a gaming facility).

territory. Before approving an acquisition, the Secretary must consider, among other things, the tribe's need for additional land; "[t]he purposes for which the land will be used"; "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls"; and "[j]urisdictional problems and potential conflicts of land use which may arise." 25 CFR § 151.10(f) (2004). Section 465 provides the proper avenue for OIN to reestablish sovereign authority over territory last held by the Oneidas 200 years ago.

In sum, the question of damages for the Tribe's ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in *Oneida II*. However, the distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate.[14]

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[14] JUSTICE STEVENS, after vigorously urging the application of laches to block further proceedings in *Oneida II*, 470 U. S., at 255, now faults the Court for rejecting the claim presented here, *post*, at 223–224. The majority indicated in *Oneida II* that application of a nonstatutory time limitation in an action for damages would be "novel." 470 U. S., at 244, n. 16; cf. *id.*, at 261–262 (STEVENS, J., dissenting in part) (acknowledging "the application of a traditional equitable defense in an action at law is something of a novelty"). No similar novelty exists when the specific relief OIN now seeks would project redress for the Tribe into the present and future. The claim to a sovereign's prerogative asserted by OIN, we hold, does "not survive eternally," *id.*, at 272 (STEVENS, J., dissenting in part); rather, it is a claim "best left in repose," *id.*, at 273 (same).

JUSTICE SOUTER, concurring.

I join the opinion of the Court with one qualification that goes to the appropriateness of considering the long dormancy of any claim to tribal authority over the parcels in question, as a basis to hold that the Oneida Indian Nation is not now immune from the taxing authority of local government. The Tribe's claim, whether affirmative or defensive, see *ante*, at 214, n. 7, is one of territorial sovereign status entitled to recognition by the territorial state sovereign and its subdivisions. The claim of present sovereign status turns not only on background law and the provisions of treaties, but also on the Tribe's behavior over a long period of time: the absence of the Tribe and tribal members from the particular lots of land, and the Tribe's failure to assert sovereignty over them. The Tribe's inaction cannot, therefore, be ignored here as affecting only a remedy to be considered later; it is, rather, central to the very claims of right made by the contending parties. Since the subject of inaction was not expressly raised as a separate question presented for review, see *ante*, at 214, n. 8, there is some question whether we should order reargument before dealing with it. I think that is unnecessary; the issue was addressed by each side in the argument prior to submission of the case, notwithstanding the terms of the questions on which review was granted.

JUSTICE STEVENS, dissenting.

This case involves an Indian tribe's claim to tax immunity on its own property located within its reservation. It does not implicate the tribe's immunity from other forms of state jurisdiction, nor does it concern the tribe's regulatory authority over property owned by non-Indians within the reservation.

For the purposes of its decision the Court assumes that the District Court and the Court of Appeals correctly resolved the major issues of fact and law that the parties debated in those courts and that the city of Sherrill (City) pre-

sented to us in its petition for certiorari. Thus, we accept those courts' conclusions that the Oneida Indian Nation of New York (Tribe) is a federally recognized Indian Tribe; that it is the successor-in-interest to the original Oneida Nation; that in 1788 the Treaty of Fort Schuyler created a 300,000-acre reservation for the Oneida; that in 1794 the Treaty of Canandaigua established that tract as a federally protected reservation; and that the reservation was not disestablished or diminished by the Treaty of Buffalo Creek in 1838. It is undisputed that the City seeks to collect property taxes on parcels of land that are owned by the Tribe and located within the historic boundaries of its reservation.

Since the outset of this litigation it has been common ground that if the Tribe's properties are "Indian Country," the City has no jurisdiction to tax them without express congressional consent.[1] For the reasons set forth at length in the opinions of the District Court and the Court of Appeals, it is abundantly clear that all of the land owned by the Tribe within the boundaries of its reservation qualifies as Indian country. Without questioning the accuracy of that conclusion, the Court today nevertheless decides that the fact that most of the reservation has been occupied and governed by non-Indians for a long period of time precludes the Tribe "from rekindling embers of sovereignty that long ago grew cold." *Ante*, at 214. This is a novel holding, and in my judgment even more unwise than the Court's holding in *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226 (1985), that the Tribe may recover damages for the alleged illegal conveyance of its lands that occurred in 1795. In that case, I argued that the "remedy for the ancient wrong established at trial should be provided by Congress, not by judges seeking to rewrite history at this late date," *id.*, at 270 (opinion dissenting in part). In the present case, the

---

[1] The District Court noted that "[n]o argument is made that should a finding be made that the properties in question are Indian Country, they are nonetheless taxable." 145 F. Supp. 2d 226, 241, n. 7 (NDNY 2001).

Tribe is not attempting to collect damages or eject landowners as a remedy for a wrong that occurred centuries ago; rather, it is invoking an ancient immunity against a city's present-day attempts to tax its reservation lands.

Without the benefit of relevant briefing from the parties, the Court has ventured into legal territory that belongs to Congress. Its decision today is at war with at least two bedrock principles of Indian law. First, only Congress has the power to diminish or disestablish a tribe's reservation.[2] Second, as a core incident of tribal sovereignty, a tribe enjoys immunity from state and local taxation of its reservation lands, until that immunity is explicitly revoked by Congress.[3] Far from revoking this immunity, Congress has specifically reconfirmed it with respect to the reservation lands of the New York Indians.[4] Ignoring these principles, the Court

---

[2] See *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be 'clear and plain'" (citations omitted)); *Solem* v. *Bartlett,* 465 U. S. 463, 470 (1984) ("Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise").

[3] See *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 764–765 (1985) (noting that the Court has "never wavered" from the view that a State's attempt to tax Indian reservation land is illegal and inconsistent with Indian title (citing *The Kansas Indians*, 5 Wall. 737 (1867), and *The New York Indians,* 5 Wall. 761 (1867))); *Cass County* v. *Leech Lake Band of Chippewa Indians,* 524 U. S. 103, 110 (1998) ("We have consistently declined to find that Congress has authorized such taxation unless it has '"made its intention to do so unmistakably clear"'").

[4] In providing New York state courts with jurisdiction over civil actions between Indians, Congress emphasized that the statute was not to be "construed as subjecting the lands within any Indian reservation in the State of New York to taxation for State or local purposes." 25 U. S. C. §233. See *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 414 U. S. 661, 680–681, n. 15 (1974) ("'The text and history of the new legislation are replete with indications that congressional consent is necessary to vali-

has done what only Congress may do—it has effectively proclaimed a diminishment of the Tribe's reservation and an abrogation of its elemental right to tax immunity. Under our precedents, whether it is wise policy to honor the Tribe's tax immunity is a question for Congress, not this Court, to decide.

As a justification for its lawmaking decision, the Court relies heavily on the fact that the Tribe is seeking *equitable* relief in the form of an injunction. The distinction between law and equity is unpersuasive because the outcome of the case turns on a narrow legal issue that could just as easily, if not most naturally, be raised by a tribe as a *defense* against a state collection proceeding. In fact, that scenario actually occurred in this case: The City brought an eviction proceeding against the Tribe based on its refusal to pay property taxes; that proceeding was removed to federal court and consolidated with the present action; the District Court granted summary judgment for the Tribe; and the Court of Appeals affirmed on the basis of tribal tax immunity.[5] Either this

---

date the exercise of state power over tribal Indians and, most significantly, that New York cannot unilaterally deprive Indians of their tribal lands or authorize such deprivations. The civil jurisdiction law, to make assurance doubly sure, contains a proviso that explicitly exempts reservations from state and local taxation . . . . Moreover, both federal and state officials agreed that the bills would retain ultimate federal power over the Indians and that federal guardianship, particularly with respect to property rights, would continue'" (quoting Gunther, Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buffalo L. Rev. 1, 16 (1958–1959))).

[5] See 337 F. 3d 139, 167 (CA2 2003). Additionally, to the extent that we are dealing with genuine equitable defenses, these defenses are subject to waiver. Here, the City sought to add the defense of laches to its answer; the District Court refused on the ground of futility, 145 F. Supp. 2d, at 259; the Court of Appeals upheld this determination, 337 F. 3d, at 168–169; and the City failed to preserve this point in its petition for certiorari or brief on the merits. The City similarly failed to preserve its impossibility defense in its submissions to this Court, and there is no indication that the City ever raised an acquiescence defense in the proceedings below.

defensive use of tax immunity should still be available to the Tribe on remand, but see *ante,* at 214, n. 7, or the Court's reliance on the distinctions between law and equity and between substantive rights and remedies, see *ante,* at 213–214, is indefensible.

In any event, as a matter of equity I believe that the "principle that the passage of time can preclude relief," *ante,* at 217, should be applied sensibly and with an even hand. It seems perverse to hold that the reliance interests of non-Indian New Yorkers that are predicated on almost two centuries of inaction by the Tribe do not foreclose the Tribe's enforcement of judicially created damages remedies for ancient wrongs, but do somehow mandate a forfeiture of a tribal immunity that has been consistently and uniformly protected throughout our history. In this case, the Tribe reacquired reservation land in a peaceful and lawful manner that fully respected the interests of innocent landowners—it purchased the land on the open market. To now deny the Tribe its right to tax immunity—at once the most fundamental of tribal rights and the least disruptive to other sovereigns—is not only inequitable, but also irreconcilable with the principle that only Congress may abrogate or extinguish tribal sovereignty. I would not decide this case on the basis of speculation about what may happen in future litigation over other regulatory issues.[6] For the answer to the ques-

---

[6] It is not necessary to engage in any speculation to recognize that the majority's fear of opening a Pandora's box of tribal powers is greatly exaggerated. Given the State's strong interest in zoning its land without exception for a small number of Indian-held properties arranged in checkerboard fashion, the balance of interests obviously supports the retention of state jurisdiction in this sphere. See *California* v. *Cabazon Band of Mission Indians,* 480 U. S. 202, 215 (1987) ("'[I]n exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members'"). Nor, as the Tribe acknowledges, Brief for Respondents 19, n. 4, could it credibly assert the right to tax or exercise other regulatory authority over reservation land owned by non-Indians. See *Atkinson Trading Co.* v. *Shirley,* 532 U. S. 645 (2001); *Strate* v. *A–1 Contractors,* 520

tion whether the City may require the Tribe to pay taxes on its own property within its own reservation is pellucidly clear. Under settled law, it may not.

Accordingly, I respectfully dissent.

U. S. 438, 456 (1997) (denying tribal jurisdiction in part because the Tribe could not "assert a landowner's right to occupy and exclude" over the land in question); see also *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408, 444–445 (1989) (opinion of STEVENS, J.) ("Because the Tribe no longer has the power to exclude nonmembers from a large portion of this area, it also lacks the power to define the essential character of the territory [through zoning]").